**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HAVERHILL CHEMICALS LLC,** | § | **CASE NO. 15-34918** |
| | § | |
| **DEBTOR.** | § | **(Chapter 11)** |
| | § | |

**EMERGENCY MOTION FOR**
**(I) AN ORDER APPROVING (A) BID PROCEDURES, (B) SALE NOTICE,**
**(C) ASSUMPTION AND ASSIGNMENT PROCEDURES, (D) BID PROTECTIONS,**
**AND (E) SCHEDULING OBJECTION DEADLINES, AUCTION AND SALE**
**HEARING, AND (II) AN ORDER APPROVING SALE OF SUBSTANTIALLY ALL**
**OF DEBTOR'S ASSETS AND ASSUMPTION AND ASSIGNMENT OF**
**CONTRACTS AND LEASES**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 23 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 23 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.

Haverhill Chemicals LLC ("Haverhill" and in the capacity as a debtor-in-possession, the "Debtor") submits this motion (the "Motion") for (i) an order approving (a) the bid procedures for the sale of substantially all of the Debtor's assets (the "Sale"); (b) the form and

manner of notice of the sale of the Sale; (c) the form and manner of notice of the assumption and assignment, including cure amounts, of executory contracts and unexpired leases; (d) bid protections for the proposed stalking horse bidder, and (e) scheduling objection deadlines, auction and a final hearing to approve the Sale; and (ii) an order approving the Sale and the assumption and assignment certain executory contracts and unexpired leases.  In support of its Motion, the Debtor respectfully states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the bankruptcy case and the Motion under 28 U.S.C. §§ 157 and 1334.  The involves a core proceeding under 28 U.S.C. § 157(b)(2).  Venue of the bankruptcy case and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory and legal predicates for the relief requested herein are §§ 105(a), 363 and 365 of Title 11 of the United States Code, 11 U.S.C. §§ 101 - 1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 6004, 6006, 9006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

3.      On September 18, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"), with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").

4.      The Debtor continues to administer its assets as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Debtor's bankruptcy case and no official committee of unsecured creditors has been established.

5.      In light of its current financial condition, the Debtor determined that the maximum value will be realized for creditors through a Section 363 sale of the Debtor's assets and operations.  Accordingly, the Debtor filed this Chapter 11 Case in order to complete a sale of substantially all of the Debtor's assets to ALTIVIA Petrochemicals, LLC ("ALTIVIA") (subject to higher or better offers in accordance with Court-approved bid procedures) and to monetize the remaining assets not included in this sale (e.g., accounts receivable and certain inventory).

6.      The Declaration of Thomas M. Wells in Support of Chapter 11 Petition and First Day Pleadings (the "Declaration") filed on the Petition Date is incorporated herein.  A detailed description of the Debtor and its business and the facts and circumstances supporting the Motion and the Debtor's Chapter 11 Cases are set forth in the Declaration.

A.      **Debtor's Business and Assets**

7.      Haverhill's principal asset is a chemical plant located in Haverhill, Ohio (the "Haverhill Plant").  Prior to June 2015, Haverhill purchased raw materials (e.g., cumene from Marathon Petroleum Corporation ("Marathon")) and operated the Haverhill Plant to produce the following chemical products for sale to its customers:

     a.  Phenol is an organic chemical used to manufacture a wide variety of chemical intermediates, including phenolic resins, bisphenol A, caprolactam and alkylphenols. Major uses for phenol include herbicides, pharmaceuticals, dyes and the production of phenolic adhesives used in wood products such as plywood. Phenol is also referred to as carbolic acid and monohydroxybenzene.

     b.  Acetone is a clear liquid organic chemical widely used to produce intermediates and non-reactive solvents, including key components in the manufacture of vitamins, pharmaceuticals, film, paint and varnishes. Acetone is a common solvent found in paints, cleaning fluids and nail polish removers. Acetone is also referred to as 2-propanone and dimethyl ketone.

     c.  Bisphenol A ("BPA") is a white, crystalline chemical used in the manufacture of epoxy resins, polycarbonate resins, flame retardants and coatings. BPA improves the stability of these and other resin systems. BPA is also referred to as diphenylolpropane, 4,4'-(1-methylethylidene) bisphenol and 4,4'-isopropylidene diphenol.

d. <u>Alpha-Methylstyrene</u> ("<u>AMS</u>") is a colorless liquid organic chemical used to enhance the heat resistance of polystyrene, polycarbonate, or other hydrocarbon resins. AMS adds heat resistance to certain resins and can be found in a wide variety of consumer plastic products, automotive parts, electronic appliance housings and protective coatings.

8.      Once the chemical products are produced, Haverhill utilizes its fleet of rail cars to ship the products to various purchasers and locations for sale to its customers.  As of the Petition Date, Haverhill owns or leases approximately 464 rail cars.

**B.      Retention of Balmoral**

9.      Bank of America, N.A., as Administrative Agent (the "<u>Agent</u>") for the parties identified as "Lenders" (collectively, the "<u>Lenders</u>"), the Lenders, and the Debtor are parties to a Credit Agreement dated as of October 31, 2011, as amended by First Amendment to Credit Agreement and Waiver dated as of April 29, 2013, Second Amendment to Credit Agreement dated as of April 17, 2014, and Third Amendment to Credit Agreement dated as of July 10, 2014 (as amended, the "<u>Credit Agreement</u>")

10.      Following defaults under the Credit Facility, on June 12, 2015, Haverhill and the Lenders reached terms for and executed a Second Forbearance Agreement.  Pursuant to the terms of the Second Forbearance Agreement, Haverhill agreed to engage an investment banker acceptable to the Lenders to promptly and diligently pursue a process for the sale of the Haverhill Plant.

11.      On July 3, 2015, Haverhill, with the consent of the Lenders, engaged Balmoral Advisors, LLC ("<u>Balmoral</u>") to spearhead Haverhill's efforts to find a buyer for the Haverhill Plant.

12.      Exigent circumstances required Balmoral to run a highly focused marketing process based on the limited liquidity available to Haverhill to continue to operate the Haverhill Plant and other business constraints.

4

13.     First, at the time of Balmoral's engagement in June 2015, Haverhill had ceased purchasing new raw materials, had idled production at Haverhill's Plant, and was in the process of liquidating its remaining inventory and collecting its remaining accounts receivable.  Because Haverhill was incurring significant cash operating losses (but had ceased generating new revenues with which to pay for these losses), Haverhill decided that its only available option was to complete an expedited sale of its assets, recognizing that a failure to complete an expedited sale would result in a complete cessation of operations at the Haverhill Plant (and the incurring of significant liabilities associated with this cessation of operations).  Put simply, the remaining cash with which the Debtor can continue its limited operations (all of which constitutes the Lender's collateral) continues to be consumed and will be exhausted shortly unless an expedited sale can be completed.

14.     Second, Haverhill's business is driven by annual contract volume with customers. Customers of Haverhill award contracts for 2016 sales volume to Haverhill and other producers in the September-December 2015 time frame, so the contract season for 2016 volume has already begun. Without the assurance that production will restart shortly at the Haverhill Plant, customers will award their contract volume to other producers, which would significantly reduce the value of the Haverhill Plant to any interested buyers..  In order to avoid missing out on the 2016 contract volume, a buyer of the Haverhill Plant must consummate a sale transaction immediately, so that such buyer can restart the Haverhill Plant and enter into discussions with customers as soon as possible regarding contracts for the 2016 contract season.

15.     Third, in order to further reduce the costs associated with idling the Haverhill Plant, on August 21, 2015, Haverhill laid off the majority of its workforce.  If a transaction can be consummated that would allow the Haverhill Plant to be restarted quickly, there is a greater

possibility that the buyer will be able to re-hire many of the former employees.  The longer it takes to consummate a transaction, the greater the risk that former employees will no longer be available (and the greater the unwillingness that a buyer would want to consummate a transaction).  The Haverhill Plant requires experienced personnel in order to operate, so the longer it takes the Haverhill Plant to resume operations, the greater the risk that a buyer will not be able to re-employ the experienced workforce that the Haverhill Plant requires.

**C.     Debtor's Pre-Petition Marketing Efforts**

16.     At the time of Balmoral's engagement, Haverhill had already provided certain information to three parties.  "Buyer A" was a major supplier to Haverhill.  "Buyer B" was a non-U.S. producer of petrochemicals and derivatives producing of many of the same chemicals produced by Haverhill.  Buyer B was considering building or acquiring production capabilities in the U.S., and was evaluating the Haverhill Plant and surrounding site for suitability.  The third party was "Supplier A," another supplier to the Haverhill Plant who was interested in supporting a transaction, but not leading an acquisition.

17.     Balmoral immediately began discussions with Buyer A, Buyer B and Supplier A. Balmoral also provided information to two additional parties, "Buyer C" and ALTIVIA.

18.     Buyer C is a privately held, Ohio-based company that contacted Balmoral to inquire about the Haverhill Plant.  An executive at Buyer C had significant prior work experience at the Haverhill Plant, the nearby Marathon plant that is the key supplier of cumene to Haverhill, and also the adjacent plant owned by Haverhill Coke Company LLC ("SunCoke") that has a steam supply agreement with Haverhill.  In addition, Buyer C was working with a consultant who was a previous plant manager of the Haverhill Plant.

19.     Balmoral invited ALTIVIA to consider a transaction based on Balmoral's prior experience with ALTIVIA.  In April 2015, Balmoral advised Axiall Corporation on the sale of its Specialty Phosgene Derivatives business to ALTIVIA.  Balmoral is also engaged to represent ALTIVIA on a potential acquisition of another chemical business, although that engagement is currently inactive.  (Balmoral's engagement with ALTIVIA is unrelated to Haverhill.  In no event will Balmoral be paid by ALTIVIA in connection with an acquisition of Haverhill).  In both cases, ALTIVIA demonstrated the willingness to move very quickly and without a financing contingency to consummate transactions.

20.     On July 21, 2015, Buyer B submitted a preliminary, non-binding indication of interest to acquire the Haverhill Plant under a timeline in which it would take several months to consummate a transaction.  On or about July 23, 2015, Buyer A dropped out of consideration without submitting a bid and on July 27, 2015, Buyer C dropped out of consideration without submitting a bid.  On July 29, ALTIVIA submitted a non-binding indication of interest to acquire the Haverhill Plant under a timeline of thirty days from term sheet to definitive agreement.

21.     On August 17, 2015, Haverhill and Balmoral hosted ALTIVIA and Buyer B (each separately) for meetings and site visits at the Haverhill Plant.  ALTIVIA also met with Marathon and SunCoke during their visit.  Immediately after the meetings, ALTIVIA re-confirmed their interest and willingness to move quickly.  Buyer B, whose team travelled to the U.S. for the meeting, stated that they would be in the U.S. visiting other sites and that they would advise Balmoral later of their level of interest.

22.     Based on the bids terms and feedback from each bidder after the site visits, on August 20, 2015, Haverhill signed a term sheet ("LOI") dated August 18, 2015 with ALTIVIA. The LOI included an initial 10-day exclusivity period and was subject to contingencies regarding

supply agreements with Marathon and SunCoke.  On August 23, 2015, Buyer B withdrew from the process.

23.     On August 28, 2015, ALTIVIA notified Balmoral stating they had reached agreement with Marathon and SunCoke regarding the supply agreements for cumene and steam, respectively, satisfying these contingences in the LOI and extending ALTIVIA's exclusivity period.  On August 31, 2015, Haverhill and Balmoral met with ALTIVIA to advance a sale transaction.

**D.      ALTIVIA Purchase Agreement**

24.     Since the end of August 2015, ALTIVIA and Haverhill have been in arms'-length negotiations for the sale of the Haverhill Plant and related assets.

25.     On or about September 18, 2015, ALTIVIA and Haverhill executed an Asset Purchase Agreement (the "Purchase Agreement")[1] attached hereto as Exhibit A.  Haverhill seeks to have this Court approve the Purchase Agreement as set forth herein.  Pursuant to the Purchase Agreement and as a condition to the continued effectiveness of the Purchase Agreement, Haverhill agreed to seek entry of an order providing ALTIVIA with a certain break-up protections, including a break-up fee in the amount of $150,000.00 (the "Break-Up Fee") and an expense reimbursement in the maximum amount of $250,000.00 (the "Expense Reimbursement", and together with the Break-Up Fee, the "Bid Protections").

26.     Since the end of August 2015, Haverhill has worked with ALTIVIA to transfer from Haverhill to ALTIVIA certain environmental operating permits issued by the state of Ohio. These include a Title V permit, a RCRA permit and a NPDES permit.

---

[1]      Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion or the Purchase Agreement

27.     ALTIVIA has made arrangements for the supply of raw materials and the supply of steam that is critical for the operational success of the Haverhill Plant.

## RELIEF REQUESTED

28.     By this Motion, the Debtor seeks entry an order in the form attached hereto as (the "Bid Procedures Order") (a) approving the bid procedures (the "Bid Procedures") for the Sale of substantially all of the Debtor's assets; (b) the form and manner of notice of the sale of the Sale; (c) the form and manner of notice of the assumption and assignment, including cure amounts, of executory contracts and unexpired leases; (d) bid protections for ALTIVIA, the proposed stalking horse bidder, and (e) scheduling objection deadlines, auction and a final hearing to approve the Sale.

29.     By this Motion, the Debtor also seeks entry of an order in the form attached hereto (the "Sale Order") approving the sale of the Acquired Assets to ALTIVIA or such other highest and best bidder (the "Accepted Bidder") and authorizing the Debtor to assume and assign certain contracts designated in the Purchase Agreement (the "Assigned Contracts")[2] and approval of the amount, if any, determined by the Debtor to be necessary to be paid to cure any existing default in accordance with Sections 365(b) and 365(f)(2) of the Bankruptcy Code (the "Cure Amount") as set forth on Exhibit B attached hereto.

## BASIS FOR RELIEF

**A.      Bid Procedures Are Appropriate**

30.     Under Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or auction.  The Debtor believes that good cause exists to expose the Acquired Assets to competitive bids to determine whether any party will make higher

---

[2]      The identification of any contract or lease as an Assigned Contract does not constitute an admission that such contract or lease is an executory contract or unexpired lease and the Debtor reserves its rights in connection with any such finding.

and better offer for the Acquired Assets, thereby maximizing the benefit to the estate.  Therefore, the Debtor respectfully requests that this Court approve the Bid Procedures.

31.     Upon Court entry of the Bid Procedures Order, the Debtor will serve the Bid Procedures Order on certain parties as set forth in the Bid Procedures Order, including all entities contacted by Balmoral or known by the Debtor to have expressed an interest in entering into a transaction involving the Acquired Assets within the last six (6) months.

**B.     Bid Protections Should Be Approved**

32.     The use of Bid Protections such as the ones proposed herein have become an established practice in asset sales involving the sale of significant assets because such bid protections enable a debtor to ensure a sale to a contractually committed bidder at a price the trustee believes is fair, while providing the potential of obtaining an enhanced recovery through a competitive bid process.

33.     Historically, bankruptcy courts have approved bidding incentives similar to the Bid Protections solely by reference to the "business judgment rule," which proscribes judicial second-guessing of the actions of a debtor taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (holding that bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); *In re Marrose Corp.*, Nos. 89 B 12171-12179 (CB), 1992 WL 33848 at *5 (Bankr. S.D.N.Y. 1992) ("[bidding incentives] are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"). *See also In re Integrated Resources*, 147 B.R. 650, 657-58 (S.D.N.Y. 1992).

34.     The Bid Protections are undoubtedly consistent with the "business judgment rule." ALTIVIA likely will not have entered into a Purchase Agreement without this bargained for protection. Because of ALTIVIA, the Debtor will be able to provide other potential buyers with a copy of the Purchase Agreement to afford such prospective bidders an opportunity to submit an asset purchase agreement marked to show changes against the Purchase Agreement. This will allow the Debtor to readily compare bids to determine which one provides the highest and best value to the estate.  The proposed Bid Protections are reasonable and consistent with the range of bidding protection typically approved by bankruptcy courts.

**C.     Sale of Assets Is A Product of Debtor's Reasonable Business Judgment**

35.     Under section 363(b)(1) of the Bankruptcy Code, "[t]he trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1). "A sale of assets under § 363, as implemented by rule 6004, requires notice and a hearing and is subject to court approval and must be supported by an articulated business justification, good business judgment, or sound business reasons." *Cadle Company v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010).  In reviewing a proposed sale of assets, a bankruptcy court should give deference to the business judgment of the debtor-in-possession when it deems the sale to be appropriate. *See Esposito v. Title Ins. Co. (In re Fernwood Mkts.)*, 73 B.R. 616, 621 n.2 (Bankr. E.D. Pa. 1987).

36.     Approval of a proposed sale of the debtor's assets outside of the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if the court finds that sound business reasons justify the transaction. *See In re Abbotts Dairies of Pennsylvania*, 788 F.2d 143, 145-147 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983).  As more fully articulated by the Fifth Circuit, in deciding whether the decision to

11

sell property of the estate under Section 363(b) is appropriate and satisfies the debtor in possession's fiduciary duty to the debtor, creditors and equity holders, the court must find that there is some articulated business justification for using, selling, or leasing the property outside the ordinary course of business. *In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986). Ultimately, whether the "proffered business justification is sufficient depends on the case." *Id*. Sales which maximize value or prevent further diminution of the value of the debtor's estate are appropriate. *Id*.; *In re Dania Corp.*, 400 F.2d 833 (5th Cir. 1968), *cert denied*, 393 U.S. 1118 (1969); *see also In re San Jacinto Glass Indus.*, 93 B.R. 934, 944 (Bankr. S.D.Tex. 1988). An emergency asset sale is permitted under the statute authorizing the trustee or debtor in possession, after notice and hearing, to sell, other than in the ordinary course of business, property of the estate and such sale need not await either confirmation of a Chapter 11 reorganization plan or conversion to Chapter 7 liquidation. *In re Brookfield Clothes, Inc.*, 31 B.R. 978 (Bankr. S.D.N.Y. 1983). In order to win court approval for the sale of estate property other than in the ordinary course of business, the trustee need not show that the sale will produce enough money to pay all, or most claims. *In re Buchanan*, 270 B.R. 689 (Bankr. N.D. Ohio 2001).

37.     Section 363 of the Bankruptcy Code does not, however, require the court to substitute its own business judgment for that of the debtor. *See e.g., In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 678 (Bankr. S.D.N.Y. 1989); *In re Highway Equip. Co.*, 61 B.R. 58, 60 (Bankr. S.D. Ohio 1986). Rather, the court should ascertain whether the debtor has articulated a valid business justification for the proposed transaction. *See e.g., Lewis v. Anderson*, 615 F.2d 778, 781 (9th Cir. 1979), *cert. denied*, 449 U.S. 869 (1980); *see also In re Airlift Int'l, Inc.*, 18 B.R. 787, 789 (Bankr S.D. Fla. 1982). Courts have always been authorized to sell all or substantially

12

all of the debtor's assets outside of the ordinary course of business if the sale is necessary to preserve the value of the assets of the estate, its creditors or interest holders. *See Abbotts Diaries*, 788 F.2d 143; *Lionel*, 722 F.2d 1063; *In re Equity Funding Corp. of America*, 492 F.2d 793, 794 (9th Cir.), *cert. denied*, 419 U.S. 964 (1974).

38.     Here, the sale of the Acquired Assets is within the Debtor's sound business judgment.  Under the proposed Sale, the sale of the Acquired Assets will result in the estate receiving the highest and best value for the Acquired Assets with the least amount of risk of diminution in the value of the estate.

**D.     Buyer Should Be Granted the Protection of Bankruptcy Code Section 363(m)**

39.     Bankruptcy Code Section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

40.     While the Bankruptcy Code does not define "good faith," "[t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (citations omitted); se*e generally Marin v. Coated Sales, Inc., (In re Coated Sales, Inc.)*, Case No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that party, to show lack of good faith, must demonstrate

"fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); se*e also In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (*quoting In re Bel Air Assocs., Ltd.*, 706 F.2d 301, 305 (10th Cir. 1983)); *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case, concentrating on "integrity of [an actor's] conduct during the sale proceedings" (*quoting In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

41.     The Debtor has spent a considerable amount of time and resources negotiating the Purchase Agreement at arm's length, with give and take on both sides.   Under these circumstances, this Court should find in the order approving the sale of the Acquired Assets that the Buyer is entitled to all of the protections of Bankruptcy Code Section 363(m).

**E.     Sale Should Be Free And Clear of Claims and Interests**

42.     Pursuant to Section 363(f) of the Bankruptcy Code, the Debtor seeks authority to sell and transfer the Acquired Assets free and clear of all claims and interests, except for the Permitted Liens and Assumed Liabilities (as such terms are defined in the Purchase Agreement), with such claims and interests to attach to the proceeds of the sale of the Acquired Assets, subject to any rights and defenses of the Debtor and other parties in interest with respect thereto.

43.     Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> > (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> >
> > (2) such entity consents;
> >
> > (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> >
> > (4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable
proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). *See also In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that Section

363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the

requirements is met).

44.     A sale free and clear of all claims and interests is necessary to maximize the value

of the Acquired Assets.  A sale subject to claims and interests would result in a lower purchase

price and be of substantially less benefit to the Debtor's estate.  A sale free and clear of liens is

particularly appropriate under the circumstances because any lien in, to or against the Acquired

Assets that exist immediately prior to the closing of the Sale will attach to the net sale proceeds

with the same validity, priority, force and effect as it had at such time, subject to the rights and

defenses of the Debtor or any other party in interest.   The Debtor submits that any party with an

interest in the Acquired Assets who does not object, or who withdraws its objection, to the Sale

or the Motion should be deemed to consent pursuant to section 363(f)(2) of the Bankruptcy

Code.  In addition, the Debtor submit that any party with an interest in the Acquired Assets who

does object to the Sale or the Motion will fall within one or more of the other subsections of

section 363(f) of the Bankruptcy Code and will be adequately protected by having its interest, if

any, attach to the net cash proceeds of the Sale ultimately attributable to the Acquired Assets

against or in which its claims an interest..

**F.     Assumption and Assignment of Contracts Is Authorized by Bankruptcy Code
        Section 365**

45.     Bankruptcy Code Sections 365(a) and (b) authorize a debtor in possession to

assume, subject to the court's approval, executory contracts or unexpired leases of the debtor.

11 U.S.C. § 365(a), (b); *In re Jamesway Corp.*, 201 B.R. 73, 76 (Bankr. S.D.N.Y. 1996).  Under

Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Bankruptcy Code Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee —
>
>> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>>
>> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>>
>> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(l).

46.    The standard applied by a court in determining whether the assumption or rejection of an executory contract or unexpired lease pursuant to section 365(a) should be approved is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See, e.g., In re Grp. of Inst. Investors, Inc. v. Chicago, Milwaukee, St. Paul and Pac. R.R. Co.*, 318 U.S. 523, 550 (1943) ("the question [of assumption] is one of business judgment"); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098–99 (2d Cir. 1993) (to decide a motion to assume the court must put itself in the position of the trustee and determine whether such assumption would be a good decision or a bad one).

47.     Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. *See In re Paolo Gucci*, 193 B.R. 411, 414 (S.D.N.Y. 1996); *see also Sharon Steel Corp. v. National Gas Fuel Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989); *In re III Enter., Inc.*, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject an executory contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment – a standard which we have concluded many times is not difficult to meet.").

48.     In the present case, the Debtor's assumption and assignment of the Assigned Contracts meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. As discussed above, the Sale will provide significant benefits to the Debtor's estate. Because the Debtor cannot obtain the benefits of the Sale without the assumption of the Assigned Contracts, the assumption of these Assigned Contracts is undoubtedly a sound exercise of the Debtor's business judgment.

49.     Further, a debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. See 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial

resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

50.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993).

51.     ALTIVIA's financial health and experience in managing this type of business provide adequate assurance of future performance.

52.     In addition, at the Sale Hearing, ALTIVIA (or such other Accepted Bidder) will demonstrate to the satisfaction of the Court adequate assurance of future performance under the Assigned Contracts. Accordingly, the Debtor submits that the assumption and assignment of the Assigned Contracts as set forth herein should be approved.

53.     The proposed Cure Amounts for the Assigned Contracts are set forth in Exhibit B. Here, the Cure Amounts will be satisfied at the Closing.

**G.      Notice of Sale Is Good and Adequate**

54.     A debtor is required to notify its creditors of any proposed sale of its assets, including a disclosure of the time and place of an auction, the terms and conditions of the sale, and the deadline for filing any objections.  The Debtor submits that the notice of the Motion and the notices proposed in the Bid Procedures Order complies with Bankruptcy Rules 2002 and 6004(a) and includes information necessary to enable interested parties to either submit an alternative proposal for the purchase of the Acquired Assets or object to the sale of the Acquired Assets.

55.     The Debtor submits that the notice of the Motion and the notices proposed in the Bid Procedures Order constitute good and adequate notice of the terms of the Sale.  Therefore, the Debtor respectfully requests the Court find that the notice has provided all parties in interest a reasonable opportunity to object or be heard regarding the relief requested by this Motion.

**H.      Waiver of the Stays Imposed By Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate**

56.     The Debtor also request that the Court waive the stays imposed by Bankruptcy Rules 6004(h) and 6006(d).  As described above, exigent circumstances exist that require an expedited sale process.  Accordingly, based on the foregoing, waiver of the fourteen-day stays imposed by Bankruptcy Rules 6004(h) amd 6006(d) are appropriate under the circumstances.

<u>**NOTICE**</u>

57.     Notice of this Motion has been or will be provided to the (1) Debtor and the Debtor's professionals; (2) the United States Trustee for the Southern District of Texas; (3) Bank of America, N.A., as Administrative Agent and Lender; (4) Regions Bank, as a Lender: (5) Wells Fargo Bank, National Association, as a Lender; (6) the 20 largest unsecured creditors of the Debtor; (7) the Internal Revenue Service; (8) all statutory committees appointed in this case; (9) all parties requested notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure; and (10) all parties on whom the Court orders notice. The Debtor submits that no further notice of this Motion is required.

<u>**REQUEST FOR EMERGENCY CONSIDERATION**</u>

58.     Pursuant to the Purchase Agreement and as a condition to the continued effectiveness of the Purchase Agreement, Haverhill agreed to seek entry of the Bid Procedures Order to provide ALTIVIA with the Bid Protections so that such order is entered no later than ten days after the Petition Date.   Upon entry of the Bid Procedures Order, ALTIVIA will also

deposit with the Debtor a $100,000.00 deposit in accordance with the terms of the Purchase Agreement.

59.     Prior to the Petition Date, Haverhill engaged in a concentrated marketing process and it believes that ALTIVIA is the best opportunity for the Debtor to sell the Debtor's assets including the Haverhill Plant.  ALTIVIA has already negotiated key arrangements for the supply of raw materials and steam necessary for the operations success of the Haverhill Plant. Furthermore, ALTIVIA has already commenced work on the transfer of environmental permits to ALTIVIA.  Simply put, ALTIVIA's offer is the only remaining offer for the Acquired Assets and, as such, represents the highest and best value to the Debtor's estate for the Acquired Assets.

60.     The Debtor believes that if it cannot satisfy these conditions in the Purchase Agreement to provide ALTIVIA with the Bid Protections, the Debtor risks that ALTIVIA will terminate the Purchase Agreement, which will result in a termination of the Debtor's use the Lenders' cash collateral and, consequently, the liquidation of the Debtor's assets and operations. Accordingly, the Debtor respectfully requests that this Court set a hearing on an emergency basis to consider entry of the Bid Procedures Order approving, among other things, the Bid Protections.

## **CONCLUSION**

WHEREFORE, the Debtor requests that this Court enter the Bid Procedures Order and the Sale Order, in substantially the forms attached hereto, authorizing the Debtor to perform the obligations provided for therein and granting such other and further relief as the Court may deem just and proper.

Dated: September 18, 2015.

Respectfully submitted,

DIAMOND McCARTHY LLP

By: */s/ Kyung S. Lee*
Kyung S. Lee
TBA No. 12128400
klee@diamondmccarthy.com
(713) 333-5125
Jason M. Rudd
TBA No. 24028786
jrudd@diamondmccarthy.com
(713) 333-5129
Charles M. Rubio
TBA No. 24083768
crubio@diamondmccarthy.com
(713) 333-5127
909 Fannin, Suite 1500
Houston, Texas  77010
(713) 333-5100  Telephone
(713) 333-5195  Facsimile

PROPOSED ATTORNEYS FOR
HAVERHILL CHEMICALS LLC,
DEBTOR AND DEBTOR-IN-
POSSESSION

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on September 18, 2015, a true and correct copy of this Motion was served on those parties on the attached service list by the method indicated, within one business day of the filing.

/s/ *Charles M. Rubio*
Charles M. Rubio