## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HAVERHILL CHEMICALS LLC, | § | CASE NO. 15-34918 |
| | § | |
| DEBTOR. | § | (Chapter 11) |
| | § | |

## DECLARATION OF THOMAS M. WELLS IN SUPPORT OF
## CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

Before the undersigned notary public appeared Thomas M. Wells, who, after being sworn, makes the following declaration pursuant to 28 U.S.C. § 1746:

1.      I am over the age of eighteen and currently serve as Vice President of Haverhill Chemicals LLC ("Haverhill" or the "Debtor").

2.      In my capacity as Vice President, I am familiar with the Debtor's daily operations, financial condition and the books and records. I hereby submit this affidavit (the "Declaration") in support of the Debtor's emergency first day motions (the "First Day Motions") in the above-captioned Chapter 11 case and to assist the Bankruptcy Court and other parties-in-interest in understanding the circumstances leading up to the commencement of this bankruptcy and the goals of this case. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents or my opinion based upon my experience, knowledge and information concerning the Debtor's operations, financial condition and the industry as a whole. If called to testify, I would testify competently to the facts set forth herein. I am authorized by the Debtor to submit this Declaration.

576764v6

## I. BACKGROUND

3.　　　On September 18, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief (the "Chapter 11 Case") under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended, the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"). The Debtor continues to administer its assets as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Case and no official committee of unsecured creditors has been established.

4.　　　In light of its current financial condition, the Debtor determined that the maximum value will be realized for creditors through a sale of the Debtor's assets and operations pursuant to section 363 of the Bankruptcy Code. Accordingly, the Debtor filed this Chapter 11 Case in order to complete a sale of substantially all of the Debtor's assets (primarily comprised of a chemical plant located in Haverhill, Ohio) to ALTIVIA Petrochemicals, LLC (or such other higher or better bidder in accordance with Bankruptcy Court-approved bid procedures) (the "Sale") and to monetize the remaining assets not included in this sale (e.g., accounts receivable).

**A.　　Debtor's Origin and Business**

5.　　　The Debtor's headquarters, including its sales, customer service, logistic, finance, accounting, IT and human resources functions, are all located at 450 Gears Road, Suite 150, Houston, Texas 77067.

6.　　　A group of investors led by Goradia Capital formed the Debtor in November 2011 to acquire Sunoco, Inc.'s ("Sunoco") chemical manufacturing facility located on six hundred

acres near the banks of the Ohio River in Haverhill, Ohio (the "Haverhill Plant"). Goradia

Capital LLC, a company owned by some of the investors, assisted in the acquisition.

7.      The Haverhill Plant was first constructed in 1961. The Haverhill Plant recently

operated two phenol production lines and a downstream Bisphenol A ("BPA") line, making

Debtor the only merchant phenol producer with an onsite BPA unit in North America.

8.      The Debtor owns and operated the Haverhill Plant to produce the following

chemical products for sale to its customers:

     a.  Phenol is an organic chemical used to manufacture a wide variety of chemical
        intermediates, including phenolic resins, bisphenol A, caprolactam and
        alkylphenols. Major uses for phenol include herbicides, pharmaceuticals, dyes and
        the production of phenolic adhesives used in wood products such as plywood.
        Phenol is also referred to as carbolic acid and monohydroxybenzene.

     b.  Acetone is a clear liquid organic chemical widely used to produce intermediates
        and non-reactive solvents, including key components in the manufacture of
        vitamins, pharmaceuticals, film, paint and varnishes. Acetone is a common
        solvent found in paints, cleaning fluids and nail polish removers. Acetone is also
        referred to as 2-propanone and dimethyl ketone.

     c.  BPA is a white, crystalline chemical used in the manufacture of epoxy resins,
        polycarbonate resins, flame retardants and coatings. BPA improves the stability of
        these and other resin systems. BPA is also referred to as diphenylolpropane, 4,4'-
        (1-methylethylidene) bisphenol and 4,4'-isopropylidene diphenol.

     d.  Alpha-Methylstyrene ("AMS") is a colorless liquid organic chemical used to
        enhance the heat resistance of polystyrene, polycarbonate, or other hydrocarbon
        resins. AMS adds heat resistance to certain resins and can be found in a wide
        variety of consumer plastic products, automotive parts, electronic appliance
        housings and protective coatings.

9.      The Debtor acquired the Haverhill Plant and its related chemical manufacturing

operations from Sunoco with the goal of becoming a major producer for phenol, acetone and

BPA. The Debtor purchased the Haverhill Plant with a strategic plan to improve production processes and upgrade technology to generate savings from production efficiencies and cost opportunities. The Debtor sought to position itself to capture increased market share as the economy improved and expected demand for chemical products rose.

10.     The Debtor's financial performance for 2012 through April 2015 is summarized as follows:

|  | **2012** | **2013** | **2014** | **Jan. – April 2015** |
|---|---|---|---|---|
| Net Sales | $470,958,000 | $528,563,000 | $484,184,000 | $96,784,000 |
| Gross Profit | 30,393,000 | 28,903,000 | (4,919,000) | 2,355,000 |
| Net Income/(Loss) | 6,488,000 | 6,777,000 | (35,962,000) | (8,481,000) |
| EBITDA | 22,476,000 | 24,094,000 | (17,479,000) | (2,138,000) |
| Operating Cash Flow | 4,684,000 | 8,130,000 | (39,699,000) | (5,474,000) |
| **Cumulative Cash Flow** | $4,684,000 | $12,814,000 | ($26,885,000) | ($32,360,000) |

11.     Prior to the Petition Date, the Debtor operated the Haverhill Plant with a workforce of approximately one hundred and seventy-three (173) employees. Immediately before the Petition Date, the Debtor reduced its workforce to fifty-three employees and one independent contractor.

**B.     Corporate Structure**

12.     Haverhill Chemicals LLC is a Texas limited liability company formed in June 2011. The Debtor's current officers and managers are:

| Name | Title |
|---|---|
| Paul Deputy | Interim Chief Financial Officer |
| Thomas M. Wells | Vice President |
| Eugene Kenyon | Vice President and Manager |
| Vijay P. Goradia | Manager |
| Hemant P. Goradia | Manager |
| Swatantra V. Jain | Manager |

13.     Haverhill Chemicals International, Inc. ("HCI") is a Nevada Corporation and wholly-owned subsidiary of the Debtor. HCI is a domestic international sales corporation (DISC) entity formed solely for the purpose of providing the Debtor with certain tax advantages.

14.     Goradia Capital provides the Debtor certain oversight, management and shared management functions, including general counsel support and key members of the Debtor's management team, pursuant to the Management and Advisory Services Agreement, dated September 1, 2011.

15.     The Debtor's Class A membership interests are allocated among the following holders. The Debtor has also issued Class B membership interests as set out below.

| Percentage | Holder |
|---|---|
| **Class A Membership Interests** ||
| 59.112% | Goradia Family Interests Ltd. |
| 26.800% | Hemant P. Goradia |
| 5.550% | Ajay Jain 2006 Trust |
| 5.550% | Manish Jain 2006 Trust |
| 1.000% | Alexandrina Barretto |
| 1.000% | Indra P. Goradia |
| 0.954% | Vijay P. Goradia |
| 0.034% | Vijay Goradia 2003 Trust |
| **Class B Membership Interests** ||
| 28.517% | Alberto Spera |
| 7.129% | Mark Winland |
| 2.376% | Mark A. Tipton |
| 3.327% | Richard I. Spaulding |
| 2.376% | Devang Goradia |
| 7.129% | Stephen Isaacs |
| 3.992% | Angela D. Iacobucci |
| 4.752% | Mark Antonvich |
| 11.882% | Thomas Wells |
| 4.752% | Rich Furlin |
| 19.011% | Eugene Kenyon |
| 2.376% | Kevin Page |
| 2.376% | Charles Clark |

**C.**     **Employees**

16.     The Debtor has fifty-three employees (twenty-four salaried and twenty-nine hourly). Employees are paid biweekly, in arrears. The Debtor has one independent contractor.

17.      The Debtor provides the employees medical insurance, dental insurance, group term life and disability insurance through a Master Agreement for Benefit Plan Administration (the "Master Benefit Agreement") under which the Debtor shares costs with Goradia Capital and a group of other companies to provide for better market access, administration efficiencies and to reduce costs.

18.     The Debtor pays a portion of its employees' premiums as well as a portion of the premiums of eligible dependents. The Debtor also provides Workers Compensation Insurance based upon applicable state regulations.

**D.**     **Pre-Petition Financing**

19.     Bank of America, N.A., as Administrative Agent (the "Agent") for the parties identified as "Lenders" (collectively, the "Lenders"), the Lenders, and the Debtor are parties to a Credit Agreement, dated as of October 31, 2011, as amended by First Amendment to Credit Agreement and Waiver dated as of April 29, 2013, Second Amendment to Credit Agreement dated as of April 17, 2014, and Third Amendment to Credit Agreement dated as of July 10, 2014 (as amended, the "Credit Agreement"), pursuant to which the Lenders made the following credit facility available to the Debtor (the "Credit Facility"): (i) a revolving credit facility in the original maximum principal amount of $70,000,000 (the "Revolving Credit Facility"); and (ii) a term loan in the original maximum principal amount of $75,000,000 (the "Term Loan").

20.     In connection with the Credit Facility, the Debtor delivered to the Agent, for the benefit of the Lenders, among other things: (i) an Open-End Mortgage with Absolute

Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of October 31, 2012 (the "Mortgage"), pursuant to which the Debtor granted the Agent a lien upon the real estate and improvements located in Scioto County, Ohio described in the Mortgage (the "Real Property") (ii) a Security Agreement dated as of October 31, 2011 (as amended, the "Security Agreement"), pursuant to which the Debtor granted the Agent, for the benefit of Lenders, a security interest in and lien upon the personal property described in the Security Agreement (the "Personal Property"); (iii) a Collateral Assignment of Rights dated as of October 31, 2011 (the "Collateral Assignment"), pursuant to which the Debtor assigned all of the Debtor's rights under the Acquisition Agreement (as defined in the Collateral Assignment) (the "Assigned Rights") to the Agent; and (iv) a Pledge Agreement dated May 30, 2014 (the "Pledge Agreement"), pursuant to which the Debtor pledged and granted to the Agent a security interest in the stock of HCI.

21.     In connection with the Credit Facility, the Agent, among other things: (i) recorded the mortgage on November 1, 2011 with the Recorder's Office for Scioto County, Ohio, in Book 310, Page 417; (ii) filed an "all assets" UCC-1 Financing Statement with the Texas Secretary of State on October 31, 2011, Filing No. 11-0031824929, naming the Debtor as debtor and the Agent as secured party; and (iii) recorded a Memorandum of Security Agreement with the Surface Transportation Board on November 14, 2011, Recordation No. 29986.

22.     HCI delivered to the Agent a Guaranty dated as of May 30, 2014 (the "Guaranty"), pursuant to which HCI, among other things, guaranteed the prompt payment and performance of all indebtedness and liabilities owing by the Debtor to the Agent and the Lenders under the Credit Agreement.

23.     In April 2013, the Debtor entered into a Subordinated Promissory Note to borrow up to $10 million ("Gorvest Note") with Gorvest LP ("Gorvest").

7

24.     In mid-2014, the Debtor restructured its ownership to obtain additional capital, raising $10 million in new equity and using $5 million of the proceeds to reduce the Term Loan and obtain concessions from the Lenders.

25.     Following defaults under the Credit Facility as detailed below, the Debtor, HCI, the Agent, and the Lenders entered into the following: (i) a Forbearance Agreement dated as of April 6, 2015, as amended by Amendment to Forbearance Agreement dated as of April 17, 2015, Second Amendment to Forbearance Agreement dated as of May 7, 2015, and Third Amendment to Forbearance Agreement dated as of May 20, 2015 (as amended, the "First Forbearance Agreement"), (ii) a Second Forbearance Agreement dated as of June 12, 2015, as amended by Amendment to Second Forbearance Agreement dated as of July 17, 2015 (as amended, the "Second Forbearance Agreement"), and (iii) a Third Forbearance Agreement dated as of July 23, 2015, as amended by Amendment to Third Forbearance Agreement dated as of August 4, 2015 and Second Amendment to Third Forbearance Agreement dated as of August 21, 2015 (as amended, the "Third Forbearance Agreement" and, together with the First Forbearance Agreement and the Second Forbearance Agreement, the "Forbearance Agreements").

26.     Pursuant to the Forbearance Agreements, the Debtor, among other things, (a) amended certain provisions contained in the Credit Agreement and the Security Agreement, (b) acknowledged the amount of the Debtor's obligations owing under the Prepetition Loan Documents (defined below), (c) confirmed that all of Agent's liens and security interests continue in full force and effect and secure all of the Debtor's obligations arising out of the Prepetition Loan Documents, and (d) released and forever discharged the Agent and the Lenders from any and all claims, counterclaims, demands, damages, debts, obligations, liabilities, actions, and causes of action arising or accruing prior to the execution of the Forbearance Agreements.

8

27. The prepetition loan documents described above, as amended, supplemented, or otherwise modified prior to the Petition Date, together with all collateral and ancillary documents executed in connection therewith are collectively referred to herein as the "Prepetition Loan Documents," and the principal, interest, costs, expenses, fees, and other amounts owing under the Prepetition Loan Documents are collectively referred to as the "Prepetition Indebtedness."

28. As of September 18, 2015, the Debtor is liable to the Agent, on behalf of the Lenders, for the Prepetition Indebtedness in the aggregate amount of at least $44,077,700.94, broken down as follows:

    a. With respect to the Revolving Credit Facility, the aggregate amount of at least $676,335.94, comprised of: (i) an outstanding, cash-collateralized letter of credit in the amount of $675,000.00; (ii) $ 1,335.94of letter of credit fees; and (iii) certain other recoverable fees (including attorneys' fees) and costs owing under the Revolving Credit Facility and related Prepetition Loan Documents. The Agent holds $675,000.00 of the Debtor's cash in a "suspense account" to cash collateralize the Letter of Credit.

    b. With respect to the Term Loan, the aggregate amount of at least $43,401,365.00, comprised of: (a) $ 43,377,470.17 of unpaid principal; (b) $23,894.83 of accrued and unpaid interest; and (c) certain other recoverable fees (including attorneys' fees) and costs owing under the Term Loan and related Prepetition Loan Documents.

29. As of the Petition Date, in addition to the Prepetition Indebtedness, the Debtor's liabilities consists of (a) less than $25,000.00 in mechanics' liens asserted against the Debtors' assets; (b) alleged secured claims against certain chillers located at the Haverhill Plant (it is not clear whether the asserted liens related to these claims were perfected as of the Petition Date); (c) less than $25,000.00 in priority unsecured claims that include, among other things, certain unpaid employee claims, (d) approximately $50,000,000.00 in general unsecured claims that include, among other claims (i) trade vendor claims, (ii) damage claims, (iii) contingent

environmental remediation claims, and (iv) approximately $8,000,000.00 owed on the Gorvest Note.

30.     As of the Petition Date, the Debtor's primary assets consisted of: (a) remaining accounts receivable, (b) remaining inventory, (c) the Haverhill Plant and its surrounding real estate, (d) equipment located at the Haverhill Plant, and (e) potential recoveries under various prepetition claims and causes of action.  All of the foregoing constitutes the Lenders' collateral.

## II. EVENTS LEADING UP TO THE
## COMMENCEMENT OF THE CHAPTER 11 CASE

**A.     Adverse Market Conditions**

31.     The Debtor took over operations of the Haverhill Plant in late 2011 with plans to implement technology and efficiency improvements while positioning itself to profit from forecasted greater chemical product demand as the post-recession economy improved. In 2012, the Debtor began implementing its strategies, but faced delays and setbacks in realizing efficiency and cost benefits. Further, the Debtor incurred large capital costs relating to the Haverhill Plant.

32.     By 2013, these ongoing hurdles hindered the Debtor's ability to meet its obligations under the Credit Facility, leading to negotiations with the Lenders and equity holders to restructure and recapitalize the Debtor through the Gorvest Note and amendments to the Credit Facility's terms.

33.     In 2014, the petroleum market's unexpected, dramatic and prolonged drop led to a comparable drop in prices for the Debtor's products.

**B.      Failed Recapitalization and Refinancing Efforts**

34.      In an effort to solve the financial difficulties facing the Debtor in 2014 and early 2015, the Debtor explored various opportunities for restructuring its business and operations. The Debtor attempted to refinance the Credit Facility with alternative lending sources. However, continued adverse petroleum market conditions and depressed asset values discouraged other lenders from extending credit on the Debtor's assets.

35.      In 2015, the Debtor was financing its operations from cash realized from collection of accounts receivable and permitted borrowings under the Revolving Credit Facility. These funds proved insufficient to sustain operations and resulted in monetary and nonmonetary defaults under the Credit Facility.

36.      In April 2015, the Debtor faced a projected cash shortfall that would hinder its ability to make key vendor payments. Following discussions with the Lenders, the Lenders and the Debtor entered into the First Forbearance Agreement, which allowed the Debtor to obtain needed short term liquidity relief; however, such short term relief failed to address the Debtor's long term liquidity problem.

37.      At the same time, the Debtor worked with its existing equity interest holders for a recapitalization of the business through a new $10 million equity investment. During these negotiations, the United States Environmental Protection Agency ("EPA") notified the Debtor of a planned environmental inspection and audit of the Haverhill Plant.

38.      Based on industry experience, such EPA inspections take months to complete, divert extensive management and employee resources, interfere with production and potentially result in required capital intensive projects. The planned EPA inspection created significant

11

uncertainty for the equity owners and another set of delays and obstacles to its restructuring and turnaround efforts. In light of these factors, discussions for injection of new equity funding to the Debtor fell through.

39.     In May 2015, the Debtor negotiated further extensions of the First Forbearance Agreement with the Lenders, which expired on June 1, 2015. On June 2, 2015, the Lenders accelerated and demanded immediate payment of all indebtedness and amounts due on the Credit Facility.

**C.     The Debtor Idles the Haverhill Plant and Initiates Marketing Efforts**

40.     Following acceleration of the Credit Facility on June 2, 2015, the Debtor and the Lenders engaged in extensive negotiations regarding the terms for the Debtor's use of the Lenders' cash collateral to process the remaining cumene in inventory, with the understanding that the Debtor may be required to begin an orderly shutdown of the Haverhill Plant. On June 12, 2015, the Debtor and Lenders executed the Second Forbearance Agreement to permit the Debtor to use cash collateral pursuant to an agreed budget through July 17, 2015.

41.     Following continued negotiations, the Debtor and the Lenders entered into a Third Forbearance Agreement, dated as of July 23, 2015, and amendments to the Third Forbearance Agreement through the Petition Date. The Forbearance Agreements permitted the Debtor to idle the Haverhill Plant – as opposed to a complete shutdown – while the Debtor located a purchaser for the Haverhill Plant.

**D.      The Debtor Engages Balmoral and Advances Sale of the Haverhill Plant**

42.      On July 3, 2015, the Debtor engaged Balmoral Advisors, LLC ("Balmoral") as its investment banker to explore a sale of the Haverhill Plant.

43.      The Debtor's financial condition, coupled with other exigent circumstances (described below) required Balmoral to run a highly focused, expedited marketing process.

44.      First, at the time of Balmoral's engagement, the Debtor had ceased purchasing new raw materials, had idled production at the Haverhill Plant, and was in the process of liquidating its remaining inventory and collecting its remaining accounts receivable. Because the Debtor was incurring significant cash operating losses (but had ceased generating new revenues with which to pay for these losses), the Debtor decided that its only available option was to complete an expedited sale of its assets, recognizing that a failure to complete an expedited sale would result in a complete shutdown of operations at the Haverhill Plan (and the incurring of significant liabilities associated with this shutdown).  Put simply, the remaining cash with which the Debtor can continue its limited operations continues to be consumed and will be exhausted shortly unless an expedited sale can be completed.

45.      Second, the Debtor's business is driven by annual contract volume with customers. Customers award contracts for 2016 sales volume in the September-December 2015 time frame. Thus, the contract season for 2016 volume has already begun. Without the assurance that the Debtor will restart production shortly at the Haverhill Plant, customers will award their contract volume to other producers, which would significantly reduce the value of the Haverhill Plant to any interested buyer. In order to avoid missing the 2016 contract volume, a new buyer of

the Haverhill Plant must consummate a sale transaction immediately, so that the buyer can restart the Haverhill Plant and enter into discussions with customers as soon as possible regarding contracts for the 2016 contract season.

46.     Third, in order to further reduce the costs associated with idling the Haverhill Plant, the Debtor laid off the majority of its workforce. If a transaction can be consummated that would allow the Haverhill Plant to be restarted quickly, there is a greater possibility that the buyer will be able to re-hire many of the former employees.  The longer it takes to consummate a transaction, the greater the risk that key former employees will no longer be available for hire (and the greater the unwillingness that a buyer would want to consummate a transaction).  The Haverhill Plant requires experienced personnel in order to operate, so the longer it takes the Haverhill Plant to resume operations, the greater the risk that a buyer will be able to re-employ the experienced workforce that the Haverhill Plant requires.

**E.     Marketing Efforts and Results**

47.     At the time of Balmoral's engagement, the Debtor had already provided certain information to three potential purchasers and strategic partners. "Buyer A" was a major supplier to the Debtor. "Buyer B" was a non-U.S. producer of petrochemicals and derivatives similar to those produced in the Haverhill Plant. Buyer B was considering building or acquiring production capabilities in the U.S., and was evaluating the Haverhill Plant for suitability. The third party, "Supplier A", was another supplier to the Haverhill Plant who was interested in supporting a transaction but not leading an acquisition.

14

48.     Balmoral immediately began discussions with Buyer A, Buyer B and Supplier A. Balmoral also engaged and provided information to two additional parties, "Buyer C" and ALTIVIA Chemicals LLC ("ALTIVIA").

49.     Buyer C is a privately held, Ohio-based company that contacted Balmoral to inquire about the Haverhill Plant. An executive at Buyer C had significant prior work experience at the Haverhill Plant, the nearby Marathon Petrochemical Corporation ("Marathon") plant that is the Debtor's key cumene supplier, and also the adjacent plant owned by Haverhill Coke Company LLC ("SunCoke") that has a steam supply agreement with the Debtor. In addition, Buyer C was working with a consultant who was a previous Haverhill Plant manager.

50.     Balmoral invited ALTIVIA to consider a transaction based on Balmoral's prior experience with ALTIVIA. In April 2015, Balmoral advised Axiall Corporation on the sale of its Specialty Phosgene Derivatives business to ALTIVIA. Balmoral is also engaged to represent ALTIVIA on a potential acquisition of another chemical business, although that engagement is currently inactive. (Balmoral's engagement with ALTIVIA is unrelated to the Debtor. In no event will Balmoral be paid by ALTIVIA in connection with an acquisition of the Haverhill Plant). In both cases, ALTIVIA demonstrated the willingness to move quickly and without a financing contingency to consummate the transaction.

51.     On July 21, 2015, Buyer B submitted a preliminary, non-binding indication of interest to acquire the Haverhill Plant on a timeline in which it would take several months to consummate a transaction. On or about July 23, 2015, Buyer A dropped out of consideration without submitting a bid.  On July 27, 2015, Buyer C dropped out of consideration without

submitting a bid. On July 29, ALTIVIA submitted a non-binding indication of interest to acquire the Haverhill Plant under a timeline of thirty days from term sheet to definitive agreement.

52.     On August 17, 2015, the Debtor and Balmoral hosted ALTIVIA and Buyer B (each separately) for meetings and site visits at the Haverhill Plant. ALTIVIA also met with Marathon and SunCoke. Immediately after the meetings, ALTIVIA re-confirmed their interest and willingness to move quickly. Buyer B, whose team travelled to the U.S. for the meeting, stated that they would be in the U.S. visiting other sites and would advise Balmoral later of their level of interest.

53.     Based on the bids and feedback from each bidder, on August 20, 2015, the Debtor signed a term sheet ("LOI") with ALTIVIA. The LOI included an initial ten-day exclusivity period and was subject to contingencies regarding supply agreements with Marathon and SunCoke. On August 23, 2015, Buyer B withdrew from the process.

54.     On August 28, 2015, ALTIVIA notified Balmoral stating they had reached agreement with Marathon and SunCoke regarding the supply agreements for cumene and steam, respectively, satisfying these contingencies in the LOI and extending ALTIVIA's exclusivity period. On August 31, 2015, the Debtor and Balmoral met with ALTIVIA to advance a sales transaction.

**F.     ALTIVIA Purchase Agreement**

55.     On September 18, 2015, ALTIVIA and the Debtor executed an Asset Purchase Agreement (the "Purchase Agreement"). Contemporaneously with the filing of this Declaration, the Debtor filed the Sale Motion (as defined below) including a copy of the Purchase Agreement

and requesting the Bankruptcy Court approve the Purchase Agreement, subject to higher offers. Pursuant to the Purchase Agreement and as a condition to the continued effectiveness of the Purchase Agreement, the Debtor agreed to seek entry of an order providing ALTIVIA with certain break-up protections, including a break-up fee in the amount of $150,000.00 (the "Break-Up Fee") and an expense reimbursement in the maximum amount of $250,000.00 (the "Expense Reimbursement", and together with the Break-Up Fee, the "Bid Protections").

56.     The Debtor files this Chapter 11 Case and the First Day Motions to advance the Sale pursuant to the Purchase Agreement to maximize the value of the Haverhill Plant.

### III. FACTS IN SUPPORT OF FIRST DAY MOTIONS[1]

57.     Contemporaneously with the filing of this Declaration, the Debtor filed various emergency First Day Motions which are necessary to effectively protect the value of its assets until completion of the Sale. The Debtor requests that orders approving each of the First Day Motions be entered as critical elements in stabilizing and facilitating its liquidation efforts during the pendency of the Chapter 11 Case. I submit that the relief requested in each of the below described motions is in the best interests of the Debtor's estate and consistent with the Debtor's reasonable business judgment.

58.     A description of the relief requested and the facts supporting each of the First Day Motions follows.

---

[1]     In this section, capitalized terms used but not defined herein have the meaning assigned to the term in the applicable motion or application.

**A.    Emergency Motion For Orders (I) Authorizing the Debtor to Pay Pre-Petition Employee Salaries, Reimbursable Employee Expenses, Employee Benefits and Other Compensation; and (II) Directing All Banks to Honor Certain Related Pre-Petition Transfers (the "<u>Employee Obligations Motion</u>")**

59.    As detailed above, the Debtor has reduced the number of employees to a core group essential to effectively liquidate the Debtor's assets. Through the Employee Obligations Motion, the Debtor requests the entry of an order authorizing the Debtor to pay, continue or otherwise honor pre-petition obligations (collectively, the "<u>Pre-Petition Employee Obligations</u>") to or for the benefit of its employees for salaries and other compensation and benefits under all plans, programs and policies implemented by the Debtor prior to the Petition Date (as set forth in the Employee Obligations Motion, the "<u>Employee Programs</u>"). The Debtor seeks immediate authority to make payments to the employees on account of Pre-Petition Employee Obligations up to the priority expense limit imposed on employee claims under § 507(a)(4) of the Bankruptcy Code.

60.    The Debtor's ability to complete the Sale of the Haverhill Plant is dependent on the continued enthusiasm, services, and expertise of its employees. Due to the disruption and stressful uncertainty that typically accompanies Chapter 11 filings, the Debtor believes that the morale of its employees may be adversely affected if it is not able to assure them that they will be fully paid for the work they have performed, whether before or after the Petition Date, and can rely on the benefits provided to them under the Employee Programs.

61.    In addition, if the Debtor fails to pay the Pre-Petition Employee Obligations, its employees will suffer extreme personal hardship. Many employees live paycheck to paycheck and would suffer severe adverse consequences if they failed to receive their full compensation.

18

Such a result would have a highly negative impact on the morale of employees who have a reasonable expectation of compensation for services rendered and likely would result in unmanageable turnover, thereby resulting in immediate and irreparable harm to the Debtor and its estate. Honoring the Pre-Petition Employee Obligations will minimize the level of disruption and preserve the loyalty of employees so necessary for the successful sale of the Debtor's assets.

**B.     Emergency Motion for Interim Order (A) Authorizing the Use of Cash Collateral Pursuant to Bankruptcy Code Section 363(c) and Granting Adequate Protection, and (B) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "<u>Cash Collateral Motion</u>")**

62.     The Debtor seeks authority on an interim basis to use Cash Collateral as defined in the Cash Collateral Motion and to grant adequate protection to the Lenders who assert an interest in the Cash Collateral.

63.     The Debtor lacks sufficient available sources of working capital and financing to carry on the operation of its business without the use of Cash Collateral. The Debtor is not generating any significant revenues from its business operations at this time, so the primary cash available for payment of the Debtor's post-petition expenses is the cash currently on deposit in the Debtor's accounts, the cash generated from collection of remaining accounts receivable, and cash to be realized from the sale of the Haverhill Plant, all of which constitutes Cash Collateral of the Lenders.

64.     The ability of the Debtor to pay employees and otherwise finance its operations is essential to the Debtor's continued viability and completion of the Sale and the Debtor's critical need for use of Cash Collateral is immediate.

65.     The Debtor has requested that the Lenders consent to the interim and limited use of Cash Collateral. The Debtor undertook arm's-length negotiations with the Lenders with

respect to the interim and limited use of Cash Collateral. The Lenders are willing to allow the Debtor to use their Cash Collateral on an interim basis pursuant to the terms and conditions set forth in the proposed interim order to pay expenses associated with the Chapter 11 Case, as identified in the interim budget ("Budget") attached to the Cash Collateral Motion.

66.     Without the immediate use of the Cash Collateral during this interim period, the Debtor will be forced to immediately cease operations at the Haverhill Plant. Cessation of operations at the Haverhill Plant would have a severe negative effect—the Debtor would incur significant financial obligations under environmental regulations governing the cessation of operations at a chemical plant.

67.      The Debtor asserts that the Haverhill Plant, in its present condition, has a value far in excess of any value that might be obtained in a Chapter 7 liquidation. A complete cessation of the Debtor's business operations, even for a short period, would result in the loss of key employees and would likely preclude a sale of the Haverhill Plant, with all creditors, including the Lenders, receiving substantially less. Accordingly, it is imperative that the Debtor receive immediate authority to use Cash Collateral as set forth in the Budget and further explained in the Cash Collateral Motion.

**C.      Emergency Motion for an Order Authorizing Maintenance of DIP Accounts with Bank of America, N.A. (the "Bank Account Motion")**

68.     Prior to the Petition Date, Debtor maintained a cash management system (the "Cash Management System") to collect, transfer and disburse funds and to accurately record all such transactions. The Cash Management System is comprised primarily of two accounts (collectively, the "Accounts") maintained with Bank of America, N.A. ("Bank of America"): a

depository operating account (account number ending -9806) (the "Operating Account") and a depository account (account number ending -1970) (the "Segregated Account").

69.     Deposits are made into the Operating Account via wire transfers, automated clearing house transfers, and deposits of physical checks. All of the Debtor's operating expenses, including payroll, are paid directly from the Operating Account.

70.     Pursuant to the Third Forbearance Agreement, the Debtor established the Segregated Account with Bank of America. On a daily basis Bank of America, in its capacity as Agent, debits cash held in the Operating Account that is in excess of the Budgeted Cash (as defined in the Third Forbearance Agreement) and transfers this cash to the Segregated Account.

71.     The Bank Account Motion seeks, pursuant to §§ 105(a) and 363(c) of the Bankruptcy Code, authority for the Debtor to maintain and use the Accounts as DIP Accounts with Bank of America, in the same manner and with the same account numbers, styles, and document forms as those employed prior to the Petition Date, and continue use of the Cash Management System.

72.     The Debtor seeks a waiver of the Guidelines of Debtors-in-Possession, Department of Justice, United States Trustee Program – Region 7 to the extent necessary to allow the Debtor to maintain the Accounts as DIP Accounts at Bank of America. Although Bank of America is not on the list of approved depositories that is kept by the United States Trustee for this district, the Accounts are FDIC-insured accounts.

73.     The maintenance of the Accounts as DIP Accounts at Bank of America during the pendency of this Chapter 11 Case will enable the Debtor to manage its cash resources in a

manner that preserves and enhances value for the benefit of all parties-in-interest. The Debtor believes that maintaining the Accounts will be more orderly and less disruptive to its continuing operations then opening new DIP Accounts.

74.     Requiring the Debtor to adopt new cash management systems and open new bank accounts at a new depository institution at this early and critical stage of this Chapter 11 Case would impose needless administrative burdens on the Debtor and cause undue disruption to the Debtor's business. Any such disruption would affect the Debtor's ability to maximize estate values for the benefit of creditors and other parties-in-interest. Moreover, such a disruption would be wholly unnecessary insofar as maintenance of the Accounts at Bank of America provides a safe and efficient means for the Debtor to maintain and manage its cash.

75.     The Debtor will continue to maintain records of all transfers into or out of the Accounts in the same manner as it did on a pre-petition basis. To guard against unauthorized transfers resulting from the unauthorized post-petition honor of pre-petition checks drawn on the Accounts, the Debtor will notify Bank of America of the commencement of this Chapter 11 Case and will instruct them not to honor any checks dated prior to the Petition Date, other than as expressly authorized by order of the Bankruptcy Court.

76.     The maintenance of the Cash Management System (including the reporting discussed above) will minimize the disruption to the Debtor's operations and is entirely consistent with the goals underlying the U.S. Trustee's Guidelines. Based on the foregoing, the Debtor believes that the maintenance of the Accounts at a non-U.S. Trustee approved financial institution is in the best interests of its estate and all parties-in-interest.

**D.      Emergency Motion for an Interim and Final Order to (I) Prohibit Utility Companies from Discontinuing, Altering or Refusing Service; (II) Deem Utility Companies Adequately Assured of Future Payment; and (III) Establish Procedures for Determining Requests for Additional Adequate Assurance (the "<u>Utilities Motion</u>")**

77.      The Debtor seeks an order pursuant to section 366 of the Bankruptcy Code authorizing the Debtor to furnish its pre-petition providers of utility services with adequate protection through a cash deposit, and prohibiting these utility providers from altering, refusing or discontinuing services on account of pre-petition invoices.

78.      In light of the nature of the services provided by utility companies, the Debtor cannot easily find replacement services. If any utility company refuses or discontinues service, even for a brief period, the Debtor's business operations could be severely disrupted. The impact of this disruption on the Debtor's business operations would be extremely harmful and would jeopardize the Debtor's ability to consummate the Sale. Therefore, it is vitally important to the Debtor's business that utility services continue uninterrupted.

79.      The Debtor intends to pay all post-petition obligations owed to utility companies through the closing of the Sale. The Debtor proposes to provide the utility companies with adequate assurance of payment in the form of: (a) prompt and timely payment of post-petition invoices; and (b) upon written request of the utility company, a cash deposit equal to fifty percent (50%) of the Debtor's average monthly bill over a three month period of utility services with the utility company. The Utilities Motion details the full proposed procedure for administering the provision of adequate assurance of payment to the utility companies and addressing requests for further relief from any utility company.

80.     The Debtor's prompt and timely post-petition payment of invoices and the payment of reasonable deposits for post-petition services provide adequate assurance to the Utility Companies that the Debtor will satisfy its post-petition obligations.

**E.      Emergency Motion for (I) an Order Approving (a) Bid Procedures, (b) Sale Notice, (c) Assumption and Assignment Procedures, (d) Bid Protections, and (e) Scheduling Objection Deadlines, Auction and Sale Hearing, and (II) an Order (a) Authorizing Sale of Substantially All of Debtor's Assets, and (b) Authorizing Assumption and Assignment of Certain Contracts (the "Sale Motion")**

81.     The Debtor seeks entry of an order approving the Sale of substantially all of its assets to ALTIVIA in accordance with the Purchase Agreement, which is subject to higher and better offers.

82.     To establish a competitive bid process to elicit higher and better offers, the Debtor seeks entry an order (the "Bid Procedures Order") approving, among other things, certain bid procedures (in the form attached to the proposed Bid Procedures Order, the "Bid Procedures") and the related sale notice.   The Debtor believes that in light of the circumstances the Bid Procedures are fair, reasonable and appropriate, and are designed to maximize recovery with respect to the sale.  The Debtor believes that the proposed sale notice (in the form attached to the proposed Bid Procedures Order) is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Bid Procedures.

83.     Pursuant to the Purchase Agreement, the Debtor has agreed to provide ALTIVIA with the Break Up Fee in the amount of $150,000.00 and the Expense Reimbursement in the maximum amount of $250,000.00.  The Debtor believes that if it cannot satisfy the conditions in the Purchase Agreement to provide ALTIVIA with the Break Up Fee and the Expenses Reimbursement, the Debtor risks that ALTIVIA will back out of the sale which could force the liquidation of the Debtor.   Therefore, the Debtor believes there are compelling and sound

business justifications for approval of the Break Up Fee and the Expenses reimbursement on an emergency basis.

**F.      Notice of Designation as Complex Chapter 11 Bankruptcy Case**

84.      The Debtor requests that the Chapter 11 Case be treated as complex case. Pursuant to the Bankruptcy Court's requirements, this Chapter 11 Case qualifies as a complex case because (i) the Debtor has both assets with an aggregate book value and liabilities in an amount greater than $50,000,000, (ii) there are more than fifty (50) parties-in-interest in the Chapter 11 Case; and (iii) there is a significant need for simplification of noticing and hearing procedures to reduce delays and expenses in the Chapter 11 Case. The Debtor requests that the Bankruptcy Court enter an order granting this Chapter 11 Case treatment as a complex case.

## V. CONCLUSION

The Debtor's immediate objective in commencing this Chapter 11 Case is to maximize the recovery to creditors through the proposed sale of the Haverhill Plant to ALTIVIA or a higher bidder. I believe that if the Bankruptcy Court grants the relief requested in each First Day Motion, the prospect for achieving these objectives will be substantially enhanced.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: September 18, 2015

Respectfully submitted,

By: _____
Thomas M. Wells
Vice President

_____

Notary Public

June 24, 2016

Commission Expires

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on September 18, 2015, a true and correct copy of this Declaration was served on those parties on the attached service list by the method indicated, within one business day of the filing.

/s/ *Charles M. Rubio*
Charles M. Rubio