## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HAVERHILL CHEMICALS LLC,** | § | **CASE NO. 15-34918** |
| | § | |
| **DEBTOR.** | § | **(Chapter 11)** |
| | § | |

### DEBTOR'S APPLICATION PURSUANT TO SECTIONS 327(a), 328(a) AND 1107(b) OF THE BANKRUPTCY CODE AND RULES 2014 AND 2016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR AUTHORIZATION TO RETAIN BALMORAL ADVISORS, LLC AS DEBTOR'S INVESTMENT BANKER *NUNC PRO TUNC* TO THE PETITION DATE

THIS APPLICATION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE APPLICATION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 23 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE APPLICATION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE APPLICATION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE APPLICATION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

Haverhill Chemicals, LLC ("Haverhill" or the "Debtor") files this application (the "Application") pursuant to §§ 327(a), 328(a) and 1107(b) of title 11 of the United States Code, 11 U.S.C. § 101 – 1532 (as amended, the "Bankruptcy Code") and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for authorization to retain Balmoral Advisors, LLC ("Balmoral") as Debtor's investment banker. In support of the Application, the Debtor relies upon the agreements between Balmoral and the Debtor, attached

as **Exhibit A-1** and **Exhibit A-2** ("Engagement Agreement") and the Declaration of Christopher D. Cerimele in support of the Application, attached as **Exhibit B** (the "Cerimele Declaration"), and respectfully states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Debtor's chapter 11 case (the "Chapter 11 Case") in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      The statutory predicate for the relief sought hereby is §§ 327, 328, and 1107(b) the Bankruptcy Code and Rules 2014 and 2016 of the Bankruptcy Rules.

## BACKGROUND

3.      On September 18, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

4.      The Debtor continues to administer its assets as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtor's Chapter 11 Case and no official committee of unsecured creditors has been established.

5.      In light of its current financial condition, the Debtor determined that the maximum value will be realized for creditors through a Section 363 sale of the Debtor's assets and operations.  Accordingly, the Debtor filed this Chapter 11 Case in order to complete a sale of substantially all of the Debtor's assets (primarily comprised of a chemical plant located in

Haverhill, Ohio) (the "Haverhill Plant") to a designated buyer (subject to higher or better offers in accordance with Bankruptcy Court-approved bid procedures) and to monetize the remaining assets not included in this sale (e.g., accounts receivable and certain inventory).

## BALMORAL'S QUALIFICATIONS AND SCOPE OF ENGAGEMENT

6.      Bank of America, N.A., as Administrative Agent (the "Agent") for the parties identified as "Lenders" (collectively, the "Lenders"), the Lenders, and the Debtor are parties to a Credit Agreement dated as of October 31, 2011, as amended by First Amendment to Credit Agreement and Waiver dated as of April 29, 2013, Second Amendment to Credit Agreement dated as of April 17, 2014, and Third Amendment to Credit Agreement dated as of July 10, 2014 (as amended, the "Credit Agreement"), pursuant to which the Lenders made the following credit facility available to the Debtor (the "Credit Facility"): (i) a revolving credit facility in the original maximum principal amount of $70,000,000 (the "Revolving Credit Facility"); and (ii) a term loan in the original maximum principal amount of $75,000,000 (the "Term Loan").

7.      On June 12, 2015, Haverhill and the Lenders executed a Second Forbearance Agreement.  Pursuant to the terms of the Second Forbearance Agreement, Haverhill agreed to engage an investment banker acceptable to the Lenders to promptly and diligently pursue a process for the sale of the Haverhill Plant.

8.      On July 3, 2015, Haverhill retained Balmoral pursuant to the Engagement Agreement (the "Original Agreement") attached hereto as **Exhibit A-1** and, on September 12, 2015, Haverhill and Balmoral entered in an amended Engagement Agreement, attached hereto as **Exhibit A-2** (the "Amended Agreement").

9.      Pursuant to the Original Agreement, Balmoral:

      a.      Familiarized itself with the Haverhill's financial condition and business;

b.  Assisted Haverhill in developing an overall strategy and timeline for a Transaction, as defined in the Agreement;

c.  Assisted Haverhill in identifying, qualifying and managing potential buyers;

d.  Assisted Haverhill in the preparation of written marketing materials describing Haverhill, it being expressly understood that Haverhill will remained solely responsible for such documents and all of the information contained therein, and will retain all rights therein;

e.  Assisted Haverhill in soliciting, coordinating and evaluating indications of interest and proposals regarding a Transaction;

f.  Assisted Haverhill in negotiating financial aspects of any Transaction; and

g.  Provided such other consulting services as may be agreed upon by Balmoral and Haverhill.

10.  Under the Original Agreement, Haverhill and Balmoral recognized that Haverhill faced liquidity and time constraints.  These constraints required Balmoral to undertake a focused marketing effort. In addition to continuing discussions with a major customer of Haverhill to purchase the Haverhill Plant, Haverhill retained Balmoral to explore a negotiated transaction with a limited number of other parties identified by Haverhill.

11.  In evaluating whether to retain Balmoral as its investment banker, Haverhill reviewed the qualifications and experience of Balmoral professionals and interviewed other investment bankers. Haverhill believes that Balmoral has significant industry knowledge and considerable experience in all facets of the chemical plant businesses.

12.  Haverhill began working with Balmoral prior to the Petition Date to locate a purchaser for the Haverhill Plant.  Balmoral has spent considerable time and effort familiarizing itself with the Haverhill Plant, its operations and condition to assist Haverhill with its marketing

and sale process.  As a direct result of Balmoral's efforts, Haverhill entered into an Asset Purchase Agreement, dated as of September 18, 2015, (the "ALTIVIA APA") with ALTIVIA Petrochemicals, LLC. ("ALTIVIA").  ALTIVIA will be acting as a stalking horse purchaser.

13.     Haverhill requires Balmoral's services and experience and knowledge of the chemical production business to ensure that they are able to obtain the best value for the benefit of Haverhill's chapter 11 estate.

14.     If Balmoral is asked to engage in discussions with more than the five parties, the Original Agreement provided that Haverhill and Balmoral would negotiate in good faith additional compensation for Balmoral's services.

15.     So as to permit Balmoral to expand the scope of its work, Haverhill executed the Amended Agreement on September 12, 2015.  Pursuant to the Amended Agreement, Balmoral will be:

a.     Assisting Haverhill in soliciting, coordinating and evaluating bids from potential buyers;

b.     Assisting Haverhill in negotiating and executing (Haverhill will be the signatory) confidentiality agreements with potential buyers;

c.     Assisting Haverhill in the set-up, management and administration of an online datasite;

d.     Assisting Haverhill in responding to information requests from potential buyers;

e.     Assisting Haverhill in scheduling, coordinating and (if needed) attending site visits and meetings between potential buyers and management;

f.     Assisting Haverhill in coordinating discussions between potential buyers and key customers and suppliers;

g.     Assisting Haverhill in connection with any bidding and auction process conducted in the Chapter 11 Case;

h.     Assisting Haverhill in providing status updates and other information requested by creditors;

i.     Attending Bankruptcy Court hearings and providing information to the Bankruptcy Court;

j.     Providing such other advisory services as may be agreed upon by Balmoral and Haverhill.

## COMPENSATION

16.     Haverhill requests that the Bankruptcy Court authorize the retention of Balmoral under the terms and conditions set forth in the Amended Agreement, and Haverhill seeks authority to compensate and reimburse Haverhill in accordance with the payment terms, procedures and conditions set forth in the Amended Agreement for services rendered and expenses incurred in connection with the Chapter 11 Case. a) **Engagement Fee:** A non-refundable cash fee (the "Engagement Fee") of $25,000 payable upon the signing of the Amended Agreement; b) **Transaction Fee:** A transaction fee (a "Transaction Fee") equal to (i) one and one-half percent (1.5%) of the Transaction Value, as defined in the Amended Agreement; plus (ii) three percent (3.0%) of Transaction Value in excess of $20 million. Subject to paragraph 16 of the Amended Agreement, the minimum Transaction Fee payable upon the closing of a Transaction is $150,000.00 (the "Minimum Fee"); c) **Expenses:** In addition to any fees that may be paid to Balmoral under the Amended Agreement, Haverhill will reimburse Balmoral monthly for its out-of-pocket expenses within 15 days of receipt of such invoices.

17.     Prior to the Petition Date, Balmoral received the Engagement Fee of $20,000.00 under the Original Agreement and $25,000.00 under the Amended Agreement.

18.     The Debtor understands that Balmoral hereafter intends to apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including but not limited to §§ 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules for the Southern District of Texas (the "Local Rules"), the guidelines (the "Guidelines") established by the United States

Trustee for the Southern District of Texas (the "U.S. Trustee"), and orders of this Court in this Chapter 11 Case (the "Orders"), for all services performed and expenses incurred after the Petition Date.

19.     Pursuant to paragraph 12 of the Amended Agreement, Haverhill has agreed to indemnify and hold harmless Balmoral from and against all losses, claims, damages, liabilities, joint or several, and expenses incurred by them (as set forth in the Amended Agreement), except to the extent resulting from the bad faith or gross negligence of Balmoral. Haverhill requests approval of this indemnification provision.

20.     Haverhill also requests that the requirement of Bankruptcy Rule 2016 be tailored to the nature of Balmoral's engagement and its compensation structure. Balmoral's compensation structure is customary in the investment banking industry. It is not the general practice of investment banking firms to keep detailed time records similar to those customarily kept by attorneys. In addition, Balmoral professionals do not maintain their time records on a "project category" basis. Accordingly, the Debtor requests that Balmoral be permitted to submit interim and final fee applications without time records. Given that Haverhill will be paying Balmoral a transaction fee, Haverhill believes that it is reasonable to permit Balmoral not to maintain time entries in this Chapter 11 Case.

## BASIS FOR RELIEF

21.     Section 327 of the Bankruptcy Code authorizes a debtor-in-possession to employ professionals that do not hold or represent an interest adverse to its estate and that are disinterested persons to assist the debtor-in-possession with its duties under the Bankruptcy Code. 11 U.S.C. § 327(a). Section 328 of the Bankruptcy Code authorizes professionals'

employment on reasonable terms and conditions, including on a retainer, hourly basis, or fixed, contingent or percentage fee basis. 11 U.S.C. § 328(a).

22.     The Debtor's retention of Balmoral is necessary to enable the Debtor to fulfill its duties under the Bankruptcy Code as a debtor-in-possession and is in the best interest of the Debtor's estate.  Balmoral has substantial expertise serving as an investment banker and addressing business issues with respect to the chemical business operated by the Debtor. Balmoral possesses the experience, ability and resources necessary to provide the full range of services the Debtor will need during the pendency of this Chapter 11 Case.

23.     Balmoral is well-acquainted with the Debtor's corporate history, debt structure, businesses, key stakeholders, and the issues that will be critically important to the Debtor and its estate during this Chapter 11 Case.

24.     Balmoral is also familiar with the Debtor's management, operations and financial and legal issues that the Debtor must resolve in order to bring this Chapter 11 Case to a successful conclusion. For these reasons, the Debtor believes that Balmoral is uniquely qualified to provide the Debtor with efficient and effective services in this Chapter 11 Case.

## BALMORAL'S DISINTERESTEDNESS

25.     To the best of the Debtor's knowledge, the partners and other professionals at Balmoral do not have any interest adverse to the Debtor or any connections with the Debtor, its creditors, directors, officers, or other significant parties in interest, or their respective attorneys and accountants, except as set forth in the Cerimele Declaration.

26.     Based upon the Cerimele Declaration, the Debtor submits that Balmoral is a "disinterested person" as that term is defined in §§ 101(14) and 1107(b) of the Bankruptcy Code. The Debtor has been informed that Balmoral will conduct an ongoing review of its files to ensure

that no disqualifying circumstances arise, and if any new relevant facts or relationships are discovered, Balmoral will supplement its disclosure to the Court. Based on the Cerimele Declaration, the Debtor believes that Balmoral is in compliance with the requirements of §§ 327(a), 328(a) and 504 of the Bankruptcy Code and Bankruptcy Rules 2014 and 2016.

27.     To check and clear potential conflicts of interest, Balmoral performed a connections check on the Debtor and other significant parties-in-interest. Except as disclosed in the Cerimele Declaration, Balmoral has indicated that based on the results of its review conducted to date, and to the best of its knowledge, neither Balmoral, nor any other employee that will work on this engagement, has any connection with the Debtor, their creditors, equity holders, or the Debtor's attorneys and accountants, or the United States Trustee, or any person employed in the office of the United States Trustee.

28.     While Balmoral has undertaken and continues to undertake efforts to identify connections with the Debtor and other parties in interest, it is possible that connections with some parties in interest have not yet been identified. Should Balmoral, through its continuing efforts or as the Chapter 11 Case progress, learn of any new connections of the nature described above, Balmoral will file promptly a supplemental declaration, as required by Bankruptcy Rule 2014 (a).

## NOTICE

29.     Notice of this Application has been or will be provided to the (1) Debtor and the Debtor's professionals; (2) the United States Trustee for the Southern District of Texas; (3) Bank of America, N.A., as Administrative Agent and Lender; (4) Regions Bank, as a Lender: (5) Wells Fargo Bank, National Association, as a Lender; (6) the 20 largest unsecured creditors of the Debtor; (7) the Internal Revenue Service; (8) all statutory committees appointed in this case;

(9) all parties requested notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure; and (10) all parties on whom the Court orders notice. The Debtor submits that no further notice of this Motion is required.

WHEREFORE, the Debtor respectfully requests that the Court enter an order authorizing the Debtor to retain Balmoral as Debtor's investment banker to Haverhill *nunc pro tunc* to the Petition Date pursuant to 11 U.S.C. §§ 327(a), 328(a) and 1107(b), Bankruptcy Rules 2014 and 2016 and any applicable Bankruptcy Local Rules and grant such further relief as may be just and necessary under the circumstances.

Dated: September 24, 2015.

Respectfully submitted,

HAVERHILL CHEMICALS LLC

By:      /s/ Thomas M. Wells
Name: Thomas M. Wells
Title:   Vice President

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 24, 2015, a true and correct copy of this Application was served on those parties on the attached Master Service List by first class mail postage prepaid within one business day of the filing.

/s/ Charles M. Rubio
Charles M. Rubio

# __EXHIBIT A__

ENGAGEMENT AGREEMENT (EXHIBIT A-1)

AMENDED ENGAGEMENT AGREEMENT (EXHIBIT A-2)

**BALMORAL ADVISORS, LLC**

10 S. Riverside Plaza, Suite 875

Chicago, IL 60606

July 3, 2015

**Confidential**

Alberto Spera

Chief Executive Officer

Haverhill Chemical LLC

450 Gears Road

Houston, TX 77067

Dear Mr. Spera,

This letter agreement (the "Agreement") sets forth and confirms our understanding and agreement between Haverhill Chemical LLC ("Haverhill" or the "Company") and Balmoral Advisors, LLC, an Illinois limited liability company ("Balmoral").

**Whereas**, Haverhill produces chemicals including phenol, acetone, bisphenol A and alpha methylstyrene at a 600+ acre site in Haverhill, Ohio, and Haverhill wishes to engage Balmoral in connection with exploring a potential Transaction (defined below).

**NOW, THEREFORE**, in consideration of the covenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Engagement**.  The Company agrees to engage Balmoral as its sole and exclusive paid financial advisor to assist the Company in connection with a possible Transaction (the "Engagement").  For purposes hereof, the term "Transaction" shall mean any sale, merger, consolidation, joint venture, partnership, spin-off, split-off, business combination, tender or exchange offer, recapitalization, acquisition, distribution, transfer or other disposition of assets or equity interests, or other transaction, involving any portion of the business, assets (excluding working capital assets) or equity interests of the Company and/or any of its subsidiaries or affiliates, or any right or option to acquire any of the foregoing, in one or more transactions (each, a "Transaction").

2. **Scope of Services**.  Balmoral's services shall consist of the following, if appropriate and requested by the Company:

   a.  Familiarizing itself with the Company's financial condition and business;

   b.  Assisting the Company in developing an overall strategy and timeline for a Transaction;

   c.  Assisting the Company in identifying, qualifying and managing potential buyers;

Balmoral Advisors – Haverhill Chemical

**Exhibit A-1 to Balmoral Application Page 1 of 9**

Page 1 of 9

    d.  Assisting the Company in the preparation of written marketing materials describing the Company, it being expressly understood that the Company will remain solely responsible for such documents and all of the information contained therein, and will retain all rights therein

    e.  Assisting the Company in soliciting, coordinating and evaluating indications of interest and proposals regarding a Transaction;

    f.  Assisting the Company in negotiating financial aspects of any Transaction; and

    g.  Providing such other consulting services as may be agreed upon by Balmoral and the Company.

Both parties acknowledge that the Company has begun initial discussions with a major customer ("Marathon") regarding a potential Transaction. The focus of the Engagement shall be to explore a negotiated Transaction with Marathon and with a limited number (less than five) of other parties who the Company has previously identified. Balmoral's compensation hereunder assumes such scope of services. In the event the Company or Balmoral (with the prior approval of the Company) contacts or engages in discussions with more than five parties regarding a Transaction during the term of this Agreement, the Company and Balmoral shall negotiate in good faith additional compensation for Balmoral's services hereunder.

3.  **Term of Agreement; Termination.**  This Agreement shall have an initial term of twelve (12) months from the date hereof, and thereafter may be extended by mutual written agreement of the parties. This Agreement may be terminated at any time by either party upon at least one (1) day prior written notice to the other party. In the event of termination, the Company shall pay Balmoral for all amounts payable under this Agreement up to and including the termination date, including reimbursable expenses. Notwithstanding the foregoing, no expiration or termination of this Agreement shall affect (a) the Company's indemnification, liability and other obligations set forth in this Agreement; (b) the confidentiality provisions set forth herein; (c) Balmoral's right to receive and the Company's obligations to pay any fees and expenses due, whether or not any Transaction shall be consummated before or after the termination, all as more fully set forth in this Agreement; and (d) numbered Paragraphs 4-18 hereof, all of which shall remain in full force and effect.

4.  **Surviving Fee Obligation.**  If this Agreement expires or is terminated and the Company consummates, or enters into an agreement in principle to engage in, any Transaction prior to the date that is twelve (12) months after such expiration or termination date (the "Tail Period"), then Balmoral shall be entitled to receive its Transaction Fee upon the consummation of such Transaction as if no such expiration or termination had occurred.

5.  **Compensation.** As compensation for services rendered under this Agreement, the Company shall pay to Balmoral the following:

    a.  <u>Engagement Fee.</u>  A non-refundable cash fee (the "Engagement Fee") of $20,000 payable upon the signing of this Agreement.

    b.  <u>Transaction Fee.</u>  A transaction fee (the "Transaction Fee") equal to (i) one and one-half percent (1.5%) of the Transaction Value (defined below); <u>plus</u> (ii) three percent (3.0%) of Transaction Value in excess of $20 million.  Subject to the provisions of Paragraph 16, the minimum Transaction Fee payable upon the closing of a Transaction shall be $150,000 (the "Minimum Fee").

**6. <u>Definition of Transaction Value.</u>**  For purposes of this Agreement, the term "Transaction Value" shall mean the following:

    a.  The total proceeds and other consideration paid or received, or to be paid or received, directly or indirectly, in connection with or in anticipation of a Transaction, including, without limitation, cash, notes, securities, and other property received or to be received by the Company or any of their respective affiliates, creditors or security holders (including, without limitation, the holders of common equity, preferred securities, convertible securities, options, warrants, stock appreciation rights or similar rights, whether or not vested); deferred non-contingent payments (such as installment payments); Contingent Payments (as defined below); and, in the case of a partnership, joint venture, or similar structure, the gross value of all cash, securities, assets and other consideration contributed, invested, committed, or otherwise made available by the Company or any other parties to such partnership, joint venture or similar structure (collectively, "Total Consideration").  Contingent Payments shall be defined as the consideration received or receivable by the Company or any of their respective employees, former or current equity holders and/or any other parties in the form of deferred performance or retention-based payments, "earn-outs", or other contingent payments based upon the occurrence of future events.

    b.  For the purpose of calculating the consideration received or receivable in connection with or in anticipation of a Transaction, any securities (other than a promissory note) will be valued at the time of the closing of the Transaction (without regard to any restrictions on transferability) as follows: (i) if such securities are traded on a stock exchange, the securities will be valued at the average last sale or closing price for the ten trading days immediately prior to the announcement of the Transaction; (ii) if such securities have not been traded prior to the announcement of the Transaction, the securities will be valued at the fair market value thereof as of the day prior to the announcement of the Transaction, as such fair market value shall be mutually agreed by Balmoral and the Company acting in good faith.  The value of any purchase money or other promissory notes, installment sales contracts or other deferred non-contingent consideration shall be deemed to be the face amount thereof, and shall be included as part of the Transaction Value for the purpose of determining the Transaction Fee. In the event the Transaction Value includes any Contingent Payments, the Company and Balmoral will negotiate in good faith to agree on the value of such Contingent Payments for the purpose of calculating that portion of the Transaction Fee in excess of the Minimum Fee to be paid to Balmoral upon

the closing of the Transaction in consideration thereof. If the parties cannot reach such an agreement, an additional Transaction Fee(s) shall be paid to Balmoral in the same proportions and at the same times as the Contingent Payments are paid or received. Any other deferred or non-cash consideration shall be valued at the fair market value thereof as of the day prior to the announcement of the Transaction, as such fair market value shall be mutually agreed by Balmoral and the Company acting in good faith. Any part of the Total Consideration held pursuant to an escrow account established before or in connection with the consummation of a Transaction shall be deemed paid or received and not contingent. Notwithstanding anything to the contrary set forth above, and subject to the provisions of Paragraph 16, in no event shall the cash Transaction Fee paid to Balmoral upon the closing of the Transaction be less than the Minimum Fee.

7. **Reimbursement of Expenses**. The Company shall reimburse Balmoral for all out-of-pocket expenses incurred in connection with Balmoral's engagement with the Company, whether or not a Transaction is consummated. Examples of out-of-pocket expenses include but are not limited to: (i) travel-related and certain other expenses, (ii) research, database and similar information charges paid to third party vendors directly in connection with the engagement, and (iii) postage, printing, telecommunication and duplicating expenses directly in connection with the engagement. Balmoral shall invoice the Company on a monthly basis for reimbursement of expenses and the Company shall reimburse Balmoral within 15 days of receipt of such invoice(s).

8. **Access to Information**. The Company shall afford Balmoral reasonable access to management and other representatives of the Company and other participants in the Transaction, as reasonably requested by Balmoral. The Company shall furnish Balmoral with such information that it reasonably requests in order to provide the services outlined in this Agreement (the "Information"). The Company will promptly notify Balmoral of any material inaccuracy, material misstatement or material omission from any Information previously provided to or discussed with Balmoral. The Company acknowledges that Balmoral will be relying upon publicly available information and Information furnished by the Company without independent verification or appraisal thereof. The Company further acknowledges that Balmoral will assume that any and all forecasts provided by the Company will have been prepared in good faith by the Company and its representatives, that they shall reasonably reflect the future prospects of the Company based on the best then currently available estimates and judgments by the Company's management regarding the future prospects of the Company. The Company agrees that Balmoral shall not be responsible for the accuracy, completeness or omission of any forecasts, information, and/or Information, whether or not publicly available, provided by the Company, or otherwise. Any advice or opinion rendered by Balmoral in connection with this Agreement shall be for the sole benefit of the Company and may not be disclosed to or relied upon, in whole or in part, by any other party without the express written consent of Balmoral.

9. **Acknowledgement.** Balmoral is not registered as a broker-dealer under federal or state securities laws. All services provided herein that will require a securities license will be provided by Christopher Cerimele, in his capacity as a registered principal with Bridge Capital Associates, Inc. ("BCA") a FINRA/SIPC broker-dealer in good standing. To the extent that services to be rendered hereunder will, or may, result in any purchase, sale or investment in stock or other securities of the Company or any other entity (as defined in the Securities Exchange Act of 1934 or the rules and regulations promulgated thereunder) (a "Securities Transaction"), such services shall be rendered to the Company by Mr. Cerimele in his capacity as a registered person with, and under the supervisory control of BCA. In the event of a Securities Transaction, the Transaction Fee related thereto will be payable to BCA (rather than Balmoral) at closing. This Agreement shall not give rise to any express or implied commitment by BCA to purchase or place any securities in connection with the transactions contemplated herein.

In accordance with the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), BCA is required to obtain, verify and record information that identifies its clients, including the Company and any purchasers of securities in a Securities Transaction, which information may include the name and address of its clients and investors, as well as other information that will allow BCA properly to identify its clients and investors.

BCA maintains important disclosures on the web site www.bridgecapitalassociates.com/disclosures.htm. These disclosures may be updated periodically on an as-needed basis. The Company agrees to accept and receive all of these disclosures by accessing BCA's web site electronically and acknowledges that hard copies are available by contacting Bridge Capital Associates, Inc. at info@bridgecapitalassociates.com.

10. **Closing Documentation.** The Company shall make all necessary regulatory filings on a timely basis and provide copies to Balmoral promptly upon filing. To the extent the services to be rendered hereunder will, or may, result in a Securities Transaction referred to in Paragraph 9 above, the Company agrees that, upon Balmoral's request after the closing of a Transaction, it shall, within three (3) days after receiving such request (or as promptly as practicable thereafter), provide copies of all final Transaction-related documentation to Balmoral, including but not limited to: executed purchase agreements, offering documents, confidential offering memoranda and other written marketing materials (if any), management presentations, teasers, confidentiality agreements, purchase agreements, Form D (for Regulation D offerings) and a copy of wire advices or checks from all parties related to the funding of a Transaction.

11. **Marketing and Publicity.** Upon announcement or consummation of a Transaction, Balmoral may, at its own expense, publish announcements and advertisements describing its role in connection with the Transaction. Such announcement shall be subject to the prior approval of the Company, which shall not be unreasonably withheld.

12. **Indemnification**. The Company agrees to indemnify and hold harmless Balmoral, BCA and their respective members, managers, directors, employees, agents, independent contractors, representatives, advisors or their respective successors, assigns and heirs (collectively, the "Indemnified Parties") from and against (i) any and all losses, claims, damages, liabilities, or expenses, joint or several, whether incurred or threatened (the "Claims"), arising out of or relating to this Agreement or to any acts or omissions of any Indemnified Party in connection with the subject matter of this Agreement, and (ii) any breach by the Company of its obligations or representations under this Agreement. Further, the Company agrees to reimburse each Indemnified Party for all reasonable, out-of-pocket expenses (including, without limitation, reasonable attorneys' fees and expenses) as they are incurred in connection with such Claims. Notwithstanding the foregoing, the Company shall not be liable to provide indemnification and reimbursement to an Indemnified Party for any such action or omission that is determined by a court of competent jurisdiction (without possibility of appeal) to be the result of gross negligence or willful misconduct by the Indemnified Party. The provisions of this indemnification and reimbursement paragraph shall remain in full force and effect whether or not a Transaction is consummated and shall survive the expiration or termination of this Agreement.

13. **Confidentiality.** The Company and Balmoral acknowledge that they have executed a non-disclosure agreement dated June 30, 2015, the terms of which shall remain in full force and effect.

14. **Limitation of Liability**. Without limiting the indemnification or hold harmless obligations of Paragraph 12 above, in no event shall Balmoral, BCA and their respective members, managers, directors, employees, agents, independent contractors, representatives, advisors or their respective successors, assigns and heirs (collectively, the "Protected Parties") individually or in the aggregate, be liable for any action or omission relating to the subject matter of this Agreement for more than the total of all fees actually paid to Balmoral by the Company pursuant to this Agreement. The provisions of this limitation of liability paragraph shall remain in full force and effect whether or not a Transaction is consummated and shall survive the expiration or termination of this Agreement.

15. **Conflicts.**

   a. The Company acknowledges that Balmoral and its affiliates may have and may continue to have consulting, advisory or other relationships with parties other than the Company, including parties who may be competitors of the Company o in similar lines of business as the Company, in which Balmoral may acquire information of interest to the Company. Balmoral shall have no obligation to disclose such information to the Company or to use such information in connection with this Agreement.

    b. Balmoral agrees that during the term of this Agreement it shall not maintain or enter into an engagement to represent a potential buyer of Haverhill in connection with a Transaction as defined in this Agreement.

16. **Lender Consent.** The Company is the borrower under that certain Credit Agreement dated October 31, 2011 (the "Credit Agreement"), by and between the Company, Bank of America, N.A., as Administrative Agent (the "Agent"), and the "Lenders" party thereto (the "Lenders"). This Paragraph 16 sets forth the terms pursuant to which the Lenders consent to the Company's engagement of Balmoral as set forth in this letter agreement. To the extent that any Transaction proposed pursuant to this letter agreement or otherwise involves property that constitutes collateral for the Credit Agreement, Balmoral understands that each Lender must consent to such Transaction in order to release any lien, security interest, claim, or encumbrance on such property, with each Lender reserving the right, in its sole discretion, to grant its consent or to withhold its consent. To the extent that the Lenders consent to a Transaction, the Lenders consent to payment of the Transaction Fee (including the Minimum Fee) payable upon the closing of such Transaction (or, in the case of Contingent Payments, when such payment has been received) solely from the proceeds of such Transaction (i.e., cash proceeds and other non-cash consideration paid to or received by the Company in connection with such Transaction). Nothing contained in this Paragraph 16 constitutes an amendment of the Credit Agreement or any related loan and security documents.

17. **Governing Law**. This Agreement will be governed by and construed in accordance with the laws of the State of Illinois without regard to principles of conflicts of law. The federal and/or state courts of Illinois shall have personal and subject matter jurisdiction over, and the parties each hereby submit to the venue of such courts with respect to, any dispute arising pursuant to this Agreement. THE COMPANY (ON ITS OWN BEHALF, AND TO THE EXTENT PERMITTED BY LAW, ON BEHALF OF ITS EQUITY HOLDERS) IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, CLAIM, SUIT OR PROCEEDING WITH RESPECT TO OR ARISING OUT OF BALMORAL'S ENGAGEMENT UNDER THIS AGREEMENT OR ITS ROLE AND PERFORMANCE IN CONNECTION HEREWITH.

18. **Miscellaneous**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and, with respect to the indemnification provisions of Paragraph 12, to the Indemnified Parties and to the provisions of Paragraph 14, to the Protected Parties. This Agreement constitutes the entire agreement between the parties and supersedes any and all prior or contemporaneous arrangements, understandings, written or oral, between them relating to the subject matter hereof, and has been duly authorized and executed by each of the parties hereto and constitutes the legal, binding obligation of each party.

The parties understand that Balmoral is being engaged as an independent consultant hereunder to provide the services described herein solely to the Company and that Balmoral is not acting as an agent or fiduciary of the Company or any other person in connection with this Agreement, and the Company agrees that it shall not make, and

hereby waives, any claim based on an assertion of such an agency or fiduciary relationship. Any duties of Balmoral arising by reason of this Agreement shall be owed solely to the Company.

This Agreement may not be amended, assigned or modified, nor may any provision be waived, except in writing by both parties.

This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

The Company agrees that it will be solely responsible for ensuring that any Transaction complies with applicable law. The Company agrees that Balmoral is not undertaking to provide any legal, regulatory, insurance, tax or other similar professional advice.

The parties agree to maintain the confidentiality of the terms of this Agreement and shall not disclose any portion hereof without the prior written consent of all parties.

*   *   *

By signing below the parties agree that the foregoing terms are in accordance with their understanding as of the date of this Agreement.

Sincerely,

**BALMORAL ADVISORS, LLC**

By: _____
Christopher D. Cerimele
Manager and Managing Director


Accepted and agreed to this ___ day of July, 2015

**HAVERHILL CHEMICAL LLC**

By: _____
Printed Name: ALBERTO STERA
Title: PRESIDENT

**AGENT WITH RESPECT ONLY TO PARAGRAPH 16 ABOVE:**

**BANK OF AMERICA, N.A.,** as Administrative Agent
for the parties identified as "Lenders" in the
Credit Agreement dated October 31, 2011

By _____
    John Schuessler
    Senior Vice President

**BALMORAL ADVISORS, LLC**
10 S. Riverside Plaza, Suite 875
Chicago, IL 60606

September 12, 2015

<u>**Confidential**</u>

Thomas M. Wells
Vice President
Haverhill Chemical LLC
450 Gears Road
Houston, TX 77067

<u>RE:</u>  **AMENDED AND RESTATED ENGAGEMENT LETTER**

Dear Mr. Wells,

This letter agreement (the "Agreement") sets forth and confirms our understanding and agreement between Haverhill Chemical LLC ("Haverhill" or the "Company") and Balmoral Advisors, LLC, an Illinois limited liability company ("Balmoral").

**Whereas,** Haverhill produces chemicals including phenol, acetone, bisphenol A and alpha methylstyrene at a 600+ acre site in Haverhill, Ohio, and Haverhill wishes to engage Balmoral in connection with exploring a potential Transaction (defined below).

**Whereas,** the Company and Balmoral previously entered into an engagement Agreement dated July 3, 2015, whereby Balmoral agreed to advise the Company with respect to a potential Transaction (defined below).

**WHEREAS,** both the Company and Balmoral desire that Balmoral continue its services in connection with a potential Transaction and now desire to amend the Agreement in many particulars and believe that the amendments will be better understood if the entire Agreement is restated upon the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the covenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. <u>**Engagement**</u>.  The Company agrees to engage Balmoral as its sole and exclusive paid financial advisor to assist the Company in connection with a possible Transaction (the "Engagement").  For purposes hereof, the term "Transaction" shall mean any sale, merger, consolidation, joint venture, partnership, spin-off, split-off, business combination, tender or exchange offer, recapitalization, acquisition, distribution, transfer or other disposition of assets or equity interests, or other transaction, involving any portion of the business, assets (excluding working capital assets) or equity interests

Balmoral Advisors – Haverhill Chemical                 **Exhibit A-2 to Balmoral**                 Page 1 of 10
                                                        **Application**
                                                        **Page 1 of 10**

of the Company and/or any of its subsidiaries or affiliates, or any right or option to acquire any of the foregoing, in one or more transactions (each, a "Transaction").

2. **Scope of Services**. Balmoral's services shall consist of the following, if appropriate and requested by the Company:

    a. <u>Services Prior to Any Bankruptcy Filing by the Company</u>:
- i. Familiarizing itself with the Company's financial condition and business;
- ii. Assisting the Company in developing an overall strategy and timeline for a Transaction;
- iii. Assisting the Company in identifying, qualifying and managing potential buyers, including developing a potential buyers list;
- iv. Assisting the Company in soliciting, coordinating and evaluating indications of interest and proposals regarding a Transaction;
- v. Assisting the Company in negotiating financial aspects of any Transaction; and
- vi. Providing such other consulting services as may be agreed upon by Balmoral and the Company.

    b. <u>Services After Any Bankruptcy Filing by the Company</u>.  In the event that the Company files bankruptcy and requests Balmoral's services in connection with a Bankruptcy Court-approved sale process, Balmoral's services shall consist of the continuation of the services listed in Paragraph 2(a) above and the provision of the following additional services, if appropriate and requested by the Company:

- i. Assisting the Company in soliciting, coordinating and evaluating bids from potential buyers;
- ii. Assisting the Company in negotiating and executing (the Company will be the signatory) confidentiality agreements with potential buyers;
- iii. Assisting the Company in the set-up, management and administration of an online datasite;
- iv. Assisting the Company in responding to information requests from potential buyers;
- v. Assisting the Company in scheduling, coordinating and (if needed) attending site visits and meetings between potential buyers and management;
- vi. Assisting the Company in coordinating discussions between potential buyers and key customers and suppliers;
- vii. Assisting the Company in connection with any bidding and auction process conducted in the Company's bankruptcy case;
- viii. Assisting the Company in providing status updates and other information requested by creditors;
- ix. Attending Bankruptcy Court proceedings and providing information to the Bankruptcy Court as reasonably requested;
- x. Providing such other advisory services as may be agreed upon by Balmoral and the Company.

3. **Term of Agreement; Termination.** This Agreement shall have an initial term of twelve (12) months from the Effective Date, and thereafter may be extended by mutual written agreement of the parties. This Agreement may be terminated at any time by either party upon at least one (1) day prior written notice to the other party.  In the event of termination, the Company shall pay Balmoral for all amounts payable under this Agreement up to and including the termination date, including reimbursable expenses. Notwithstanding the foregoing, no expiration or termination of this Agreement shall affect (a) the Company's indemnification, liability and other obligations set forth in this Agreement; (b) the confidentiality provisions set forth herein; (c) Balmoral's right to receive and the Company's obligations to pay any fees and expenses due, whether or not any Transaction shall be consummated before or after the termination, all as more fully set forth in this Agreement; and (d) numbered Paragraphs 4-18 hereof, all of which shall remain in full force and effect.

4. **Surviving Fee Obligation.**  If this Agreement expires or is terminated and the Company consummates, or enters into an agreement in principle to engage in, any Transaction prior to the date that is twelve (12) months after such expiration or termination date (the "Tail Period"), then Balmoral shall be entitled to receive its Transaction Fee upon the consummation of such Transaction as if no such expiration or termination had occurred.

5. **Compensation.** As compensation for services rendered under this Agreement, the Company shall pay to Balmoral the following:

   a. _Engagement Fees._  The Company previously paid Balmoral a non-refundable cash fee (the "Engagement Fee") of $20,000 on the Effective Date.  In recognition of the fact that the Company would likely file bankruptcy in order to consummate a Transaction and would likely request that Balmoral perform some or all of the services in Paragraph 2b hereof in connection with such bankruptcy case, the Company shall also pay to Balmoral an additional Engagement Fee of $25,000 (the "Additional Engagement Fee") upon the signing of this Agreement; provided, however, that the Additional Engagement Fee shall be refunded by Balmoral to the Company in the event that the Company does not commence a bankruptcy case and file a motion for approval of a Transaction in such bankruptcy case by September 25, 2015. .

   b. _Transaction Fee._  A transaction fee (the "Transaction Fee") equal to (i) one and one-half percent (1.5%) of the Transaction Value (defined below); plus (ii) three percent (3.0%) of Transaction Value in excess of $20 million.  Subject to the provisions of Paragraph 16, the minimum Transaction Fee payable upon the closing of a Transaction shall be $150,000 (the "Minimum Fee").

6. **Definition of Transaction Value.**  For purposes of this Agreement, the term "Transaction Value" shall mean the following:

**Exhibit A-2 to Balmoral Application Page 3 of 10**

a. The total proceeds and other consideration paid or received, or to be paid or received, directly or indirectly, in connection with or in anticipation of a Transaction, including, without limitation, cash, notes, securities, and other property received or to be received by the Company or any of their respective affiliates, creditors or security holders (including, without limitation, the holders of common equity, preferred securities, convertible securities, options, warrants, stock appreciation rights or similar rights, whether or not vested); deferred non-contingent payments (such as installment payments); Contingent Payments (as defined below); with respect to a Transaction involving a credit bid in a Bankruptcy Court-approved sale process, the dollar amount of such credit bid; and, in the case of a partnership, joint venture, or similar structure, the gross value of all cash, securities, assets and other consideration contributed, invested, committed, or otherwise made available by the Company or any other parties to such partnership, joint venture or similar structure (collectively, "Total Consideration").   Contingent Payments shall be defined as the consideration received or receivable by the Company or any of their respective employees, former or current equity holders and/or any other parties in the form of deferred performance or retention-based payments, "earn-outs", or other contingent payments based upon the occurrence of future events.

b. For the purpose of calculating the consideration received or receivable in connection with or in anticipation of a Transaction, any securities (other than a promissory note) will be valued at the time of the closing of the Transaction (without regard to any restrictions on transferability) as follows: (i) if such securities are traded on a stock exchange, the securities will be valued at the average last sale or closing price for the ten trading days immediately prior to the announcement of the Transaction; (ii) if such securities have not been traded prior to the announcement of the Transaction, the securities will be valued at the fair market value thereof as of the day prior to the announcement of the Transaction, as such fair market value shall be mutually agreed by Balmoral and the Company acting in good faith.  The value of any purchase money or other promissory notes, installment sales contracts or other deferred non-contingent consideration shall be deemed to be the face amount thereof, and shall be included as part of the Transaction Value for the purpose of determining the Transaction Fee. In the event the Transaction Value includes any Contingent Payments, the Company and Balmoral will negotiate in good faith to agree on the value of such Contingent Payments for the purpose of calculating that portion of the Transaction Fee in excess of the Minimum Fee to be paid to Balmoral upon the closing of the Transaction in consideration thereof.  If the parties cannot reach such an agreement, an additional Transaction Fee(s) shall be paid to Balmoral in the same proportions and at the same times as the Contingent Payments are paid or received. Any other deferred or non-cash consideration shall be valued at the fair market value thereof as of the day prior to the announcement of the Transaction, as such fair market value shall be mutually agreed by Balmoral and the Company acting in good faith.  Any part of the Total Consideration held pursuant to an escrow account established before or in

connection with the consummation of a Transaction shall be deemed paid or received and not contingent. Notwithstanding anything to the contrary set forth above, and subject to the provisions of Paragraph 16, in no event shall the cash Transaction Fee paid to Balmoral upon the closing of the Transaction be less than the Minimum Fee.

7. **Reimbursement of Expenses**. The Company shall reimburse Balmoral for all out-of-pocket expenses incurred in connection with Balmoral's engagement with the Company, whether or not a Transaction is consummated. Examples of out-of-pocket expenses include but are not limited to: (i) travel-related and certain other expenses, (ii) research, database and similar information charges paid to third party vendors directly in connection with the engagement, and (iii) postage, printing, telecommunication and duplicating expenses directly in connection with the engagement. Balmoral shall invoice the Company on a monthly basis for reimbursement of expenses and the Company shall reimburse Balmoral within 15 days of receipt of such invoice(s).

8. **Access to Information**. The Company shall afford Balmoral reasonable access to management and other representatives of the Company and other participants in the Transaction, as reasonably requested by Balmoral. The Company shall furnish Balmoral with such information that it reasonably requests in order to provide the services outlined in this Agreement (the "Information"). The Company will promptly notify Balmoral of any material inaccuracy, material misstatement or material omission from any Information previously provided to or discussed with Balmoral. The Company acknowledges that Balmoral will be relying upon publicly available information and Information furnished by the Company without independent verification or appraisal thereof. The Company further acknowledges that Balmoral will assume that any and all forecasts provided by the Company will have been prepared in good faith by the Company and its representatives, that they shall reasonably reflect the future prospects of the Company based on the best then currently available estimates and judgments by the Company's management regarding the future prospects of the Company. The Company agrees that Balmoral shall not be responsible for the accuracy, completeness or omission of any forecasts, information, and/or Information, whether or not publicly available, provided by the Company, or otherwise. Any advice or opinion rendered by Balmoral in connection with this Agreement shall be for the sole benefit of the Company and may not be disclosed to or relied upon, in whole or in part, by any other party without the express written consent of Balmoral.

9. **Acknowledgement.** Balmoral is not registered as a broker-dealer under federal or state securities laws. All services provided herein that will require a securities license will be provided by Christopher Cerimele, in his capacity as a registered principal with Bridge Capital Associates, Inc. ("BCA") a FINRA/SIPC broker-dealer in good standing. To the extent that services to be rendered hereunder will, or may, result in any purchase, sale or investment in stock or other securities of the Company or any other entity (as defined in the Securities Exchange Act of 1934 or the rules and regulations promulgated thereunder) (a "Securities Transaction"), such services shall be rendered to the Company by Mr. Cerimele in his capacity as a registered person with, and under the

supervisory control of BCA. In the event of a Securities Transaction, the Transaction Fee related thereto will be payable to BCA (rather than Balmoral) at closing. This Agreement shall not give rise to any express or implied commitment by BCA to purchase or place any securities in connection with the transactions contemplated herein.

In accordance with the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), BCA is required to obtain, verify and record information that identifies its clients, including the Company and any purchasers of securities in a Securities Transaction, which information may include the name and address of its clients and investors, as well as other information that will allow BCA properly to identify its clients and investors.

BCA maintains important disclosures on the web site www.bridgecapitalassociates.com/disclosures.htm. These disclosures may be updated periodically on an as-needed basis. The Company agrees to accept and receive all of these disclosures by accessing BCA's web site electronically and acknowledges that hard copies are available by contacting Bridge Capital Associates, Inc. at info@bridgecapitalassociates.com.

10. **Closing Documentation.** The Company shall make all necessary regulatory filings on a timely basis and provide copies to Balmoral promptly upon filing. To the extent the services to be rendered hereunder will, or may, result in a Securities Transaction referred to in Paragraph 9 above, the Company agrees that, upon Balmoral's request after the closing of a Transaction, it shall, within three (3) days after receiving such request (or as promptly as practicable thereafter), provide copies of all final Transaction-related documentation to Balmoral, including but not limited to: executed purchase agreements, offering documents, confidential offering memoranda and other written marketing materials (if any), management presentations, teasers, confidentiality agreements, purchase agreements, Form D (for Regulation D offerings) and a copy of wire advices or checks from all parties related to the funding of a Transaction.

11. **Marketing and Publicity.** Upon announcement or consummation of a Transaction, Balmoral may, at its own expense, publish announcements and advertisements describing its role in connection with the Transaction. Such announcement shall be subject to the prior approval of the Company, which shall not be unreasonably withheld.

12. **Indemnification.** The Company agrees to indemnify and hold harmless Balmoral, BCA and their respective members, managers, directors, employees, agents, independent contractors, representatives, advisors or their respective successors, assigns and heirs (collectively, the "Indemnified Parties") from and against (i) any and all losses, claims, damages, liabilities, or expenses, joint or several, whether incurred or threatened (the "Claims"), arising out of or relating to this Agreement or to any acts or omissions of any Indemnified Party in connection with the subject matter of this Agreement, and (ii) any breach by the Company of its obligations or representations under this Agreement. Further, the Company agrees to reimburse each Indemnified Party for all reasonable, out-of-pocket expenses (including, without limitation, reasonable attorneys' fees and

expenses) as they are incurred in connection with such Claims.  Notwithstanding the foregoing, the Company shall not be liable to provide indemnification and reimbursement to an Indemnified Party for any such action or omission that is determined by a court of competent jurisdiction (without possibility of appeal) to be the result of gross negligence or willful misconduct by the Indemnified Party. The provisions of this indemnification and reimbursement paragraph shall remain in full force and effect whether or not a Transaction is consummated and shall survive the expiration or termination of this Agreement.

13. **Confidentiality.**  The Company and Balmoral acknowledge that they have executed a non-disclosure agreement dated June 30, 2015, the terms of which shall remain in full force and effect.

14. **Limitation of Liability**.   Without limiting the indemnification or hold harmless obligations of Paragraph 12 above, in no event shall Balmoral, BCA and their respective members, managers, directors, employees, agents, independent contractors, representatives, advisors or their respective successors, assigns and heirs (collectively, the "Protected Parties") individually or in the aggregate, be liable for any action or omission relating to the subject matter of this Agreement for more than the total of all fees actually paid to Balmoral by the Company pursuant to this Agreement.   The provisions of this limitation of liability paragraph shall remain in full force and effect whether or not a Transaction is consummated and shall survive the expiration or termination of this Agreement.

15. **Conflicts.**

   a. The Company acknowledges that Balmoral and its affiliates may have and may continue to have consulting, advisory or other relationships with parties other than the Company, including parties who may be competitors of the Company o in similar lines of business as the Company, in which Balmoral may acquire information of interest to the Company.  Balmoral shall have no obligation to disclose such information to the Company or to use such information in connection with this Agreement.

   b. Balmoral agrees that during the term of this Agreement it shall not maintain or enter into an engagement to represent a potential buyer of Haverhill in connection with a Transaction as defined in this Agreement.

16. **Lender Consent.**  The Company is the borrower under that certain Credit Agreement dated October 31, 2011 (the "Credit Agreement"), by and between the Company, Bank of America, N.A., as Administrative Agent (the "Agent"), and the "Lenders" party thereto (the "Lenders").  This Paragraph 16 sets forth the terms pursuant to which the Lenders consent to the Company's engagement of Balmoral as set forth in this letter agreement. To the extent that any Transaction proposed pursuant to this letter agreement or otherwise involves property that constitutes collateral for the Credit Agreement, Balmoral understands that each Lender must consent to such Transaction in order to

release any lien, security interest, claim, or encumbrance on such property, with each Lender reserving the right, in its sole discretion, to grant its consent or to withhold its consent. To the extent that the Lenders consent to a Transaction, the Lenders consent to payment of the Transaction Fee (including the Minimum Fee) payable upon the closing of such Transaction (or, in the case of Contingent Payments, when such payment has been received), provided that such payment shall be paid first from the proceeds of such Transaction (i.e., cash proceeds and other non-cash consideration paid to or received by the Company in connection with such Transaction). Nothing contained in this Paragraph 16 constitutes an amendment of the Credit Agreement or any related loan and security documents.

17. **Governing Law**. This Agreement will be governed by and construed in accordance with the laws of the State of Illinois without regard to principles of conflicts of law. The federal and/or state courts of Illinois shall have personal and subject matter jurisdiction over, and the parties each hereby submit to the venue of such courts with respect to, any dispute arising pursuant to this Agreement. THE COMPANY (ON ITS OWN BEHALF, AND TO THE EXTENT PERMITTED BY LAW, ON BEHALF OF ITS EQUITY HOLDERS) IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, CLAIM, SUIT OR PROCEEDING WITH RESPECT TO OR ARISING OUT OF BALMORAL'S ENGAGEMENT UNDER THIS AGREEMENT OR ITS ROLE AND PERFORMANCE IN CONNECTION HEREWITH.

18. **Miscellaneous**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and, with respect to the indemnification provisions of Paragraph 12, to the Indemnified Parties and to the provisions of Paragraph 14, to the Protected Parties. This Agreement constitutes the entire agreement between the parties and supersedes any and all prior or contemporaneous arrangements, understandings, written or oral, between them relating to the subject matter hereof, and has been duly authorized and executed by each of the parties hereto and constitutes the legal, binding obligation of each party.

The parties understand that Balmoral is being engaged as an independent consultant hereunder to provide the services described herein solely to the Company and that Balmoral is not acting as an agent or fiduciary of the Company or any other person in connection with this Agreement, and the Company agrees that it shall not make, and hereby waives, any claim based on an assertion of such an agency or fiduciary relationship. Any duties of Balmoral arising by reason of this Agreement shall be owed solely to the Company.

This Agreement may not be amended, assigned or modified, nor may any provision be waived, except in writing by both parties.

This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

The Company agrees that it will be solely responsible for ensuring that any Transaction complies with applicable law. The Company agrees that Balmoral is not undertaking to provide any legal, regulatory, insurance, tax or other similar professional advice.

The parties agree to maintain the confidentiality of the terms of this Agreement and shall not disclose any portion hereof without the prior written consent of all parties or except as necessary to obtain approval of this Agreement (or any of the transactions contemplated in this Agreement) or any Transaction by a Bankruptcy Court having jurisdiction over the Company.

Notwithstanding the date of this document, the effective date of the Agreement shall remain as of July 3, 2015 (the "Effective Date").

\* \* \*

By signing below the parties agree that the foregoing terms are in accordance with their understanding as of the date of this Agreement.

Sincerely,

BALMORAL ADVISORS, LLC

By: _____
Christopher D. Cerimele
Manager and Managing Director

Accepted and agreed to this _18th_ day of September, 2015 (with an effective date as of July 3, 2015)

HAVERHILL CHEMICAL LLC

By: _____

Printed Name: _Thomas_
Title: _Vice President_

AGENT WITH RESPECT ONLY TO PARAGRAPH 16 ABOVE:

Exhibit A-2 to Balmoral
Application
Page 9 of 10

**BANK OF AMERICA, N.A.,** as Administrative Agent
for the parties identified as "Lenders" in the
Credit Agreement dated October 31, 2011

By_____
John Schuessler
Senior Vice President

# **EXHIBIT B**

CERIMELE DECLARATION

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HAVERHILL CHEMICALS LLC, | § | CASE NO. 15-34918 |
| | § | |
| DEBTOR. | § | (Chapter 11) |
| | § | |
| | § | |

## DECLARATION OF CHRISTOPHER D. CERIMELE IN SUPPORT OF DEBTOR'S APPLICATION TO EMPLOY BALMORAL ADVISORS, LLC AS DEBTOR'S INVESTMENT BANKER *NUNC PRO TUNC* TO THE PETITION DATE

I, Christopher D. Cerimele, declare under penalty of perjury as follows:

1.      I am Manager and Managing Director of Balmoral Advisors, LLC ("Balmoral"), located at 10 S. Riverside Plaza, Suite 875, Chicago, IL 60606.

2.      I make this declaration in support of Debtor's Application Pursuant to Sections 327(a), 328(a) and 1107(b) of the Bankruptcy Code and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure for Authorization to Retain Balmoral, as Debtor's Investment Banker *Nunc Pro Tunc* to the Petition Date ("Application").

3.      Unless otherwise indicated, capitalized terms have the meanings ascribed to them in the Application.

4.      Except as otherwise noted, all facts set forth in this declaration are based upon my personal knowledge, upon the client and matter records of Balmoral reviewed by me and other professionals at Balmoral under my supervision and direction, or derived from information available to me, which I believe to be true and correct.

a.      **Retention, Prior Representation, and Scope of Services**

5.      Effective July 3, 2015, Haverhill Chemicals LLC (the "Debtor" or "Haverhill")
retained Balmoral pursuant to an engagement letter (the Original Agreement") to assist Haverhill
with a transaction to sell the Haverhill Plant.

6.      Balmoral has provided services and advice to the Debtor under the Original
Agreement on a continuous basis since July 3, 2015.

7.      Throughout the representation, Balmoral has been involved in advising the
Debtor's management and has gained knowledge of the Debtor's business, operations, capital
structure, and key commercial and financial issues.

8.      So as to expand the scope of Balmoral's services, Haverhill executed an Amended
Engagement Agreement (the "Amended Agreement") on September 12, 2015.  Pursuant to the
Amended Agreement, Balmoral will be:

a.      Assisting Haverhill in soliciting, coordinating and evaluating bids from
potential buyers;

b.      Assisting Haverhill in negotiating and executing (Haverhill will be the
signatory) confidentiality agreements with potential buyers;

c.      Assisting Haverhill in the set-up, management and administration of an
online datasite;

d.      Assisting Haverhill in responding to information requests from potential
buyers;

e.      Assisting Haverhill in scheduling, coordinating and (if needed) attending
site visits and meetings between potential buyers and management;

f.      Assisting Haverhill in coordinating discussions between potential buyers
and key customers and suppliers;

g.      Assisting Haverhill in connection with any bidding and auction process
conducted in the Chapter 11 Case;

h.      Assisting Haverhill in providing status updates and other information
requested by creditors;

      i.      Attending Bankruptcy Court hearings and providing information to the Bankruptcy Court;

      j.      Providing such other advisory services as may be agreed upon by Balmoral and Haverhill.

9.     This foregoing non-exclusive list describes services essential to the Debtor in the Chapter 11 Case.  These services represent a continuation of the investment banking services provided to the Debtor since Haverhill retained Balmoral on July 3, 2015.

**b.**     **Qualifications, Proposed Compensation, and Pre-Petition Compensation**

10.     I founded Balmoral on July 30, 2014, and we began our first assignment, advising a potential bidder in a Section 363 sale process, on August 2, 2014.  Prior to founding Balmoral, I gained extensive experience advising on transaction involving chemical plants and companies involved in chemical production. I have been an investment banker since 1999 and over the course of my career have advised on chemical and industrial transactions with a cumulative value in excess of $18 billion.  I founded and/or led the global chemicals practices of two international mid-market investment banks, Lincoln International and Houlihan Lokey.

11.     In addition to the transactions noted above, my clients at prior firms have included (among others) Quad C Management on the sale of Royal Adhesive to Arsenal Capital Partners, GenNx360 Capital Partners on the sale of SiVance to Milliken, Georgia Gulf in its merger with the chemicals division of PPG Industries, Eastman Chemical on its acquisition of Knowlton Technologies, and Chemtura Corporation on the sale of its antioxidants business to SK Capital Partners.

12.     Balmoral is an independent, boutique consulting and advisory firm focusing on mid-market corporate finance and transaction advisory services for chemical and industrial companies.  Areas of expertise include mergers & acquisitions, exclusive sales, divestitures and

**Exhibit B to Balmoral Application**
**Page 3 of 8**

corporate carve-outs, distressed M&A, business & transaction advisory, private capital raising and strategic alternatives advisory.

13.     Balmoral has recently advised on two completed transactions involving chemical businesses.  In April 2014, Balmoral advised Axiall Corporation on the sale of its Specialty Phosgene Derivatives plant in LaPorte, Texas to ALTIVIA Chemicals, LLC.  In August 2014, Balmoral advised East West Copolymer LLC ("EastWest") in a debt refinancing.  East West was formed in 2014 as the investment platform to purchase the Lion Copolymer SBR/NBR business located in Baton Rouge, Louisiana (the "Baton Rouge Facility").   The Baton Rouge Facility had been idled for three months prior to the purchase by East West, and East West restarted the plant in connection with the purchase transaction.

14.     Balmoral is also currently advising a large chemical producer on the sale of a chemical production facility in North America.

15.     I have been a frequent speaker on chemical industry, M&A and capital markets topics, and have written about or been quoted by chemical industry magazines on topics related to M&A for chemical companies.  In 2010, I received a 40 Under 40 Recognition Award from *The M&A Advisor*.

16.     I also have experience relevant to the bankruptcy process.  In addition to the aforementioned assignment representing a bidder in a 363 sale process in August 2014, I advised Atchison Casting Corporation on the sale of five foundries in a Section 363 sale process.  In 2010, I testified as an expert in court on behalf of the Official Committee of Unsecured Creditors in connection with the Chemtura Corporation bankruptcy proceeding.

17.     Balmoral does not offer securities and the Haverhill transaction does not involve the sale of securities. All services I provide that require a securities license are provided by me in

my capacity as a registered principal with Bridge Capital Associates, Inc., a FINRA/SIPC broker-dealer in good standing, with whom I hold registrations as a General Securities Principal, a General Securities Representative and an Investment Banking Representative.

18.    The Balmoral team for this engagement will be led by me and will include Matthew R. Birch, Nathan P. Jacobs, and other junior personnel who may provide support from time to time.  The professional biographies of each of these advisors are provided at Exhibit A to this Declaration, and are incorporated as if set forth fully herein.

19.    Subject to Court approval, the Debtor's employment of Balmoral will be governed by the Amended Agreement.  Compensation and reimbursement of expenses will be made by the Debtor pursuant to the Amended Agreement and upon Court approval pursuant to section 330 of the Bankruptcy Code.  The compensation includes a Transaction Fee as defined in the Agreement.

20.    I believe these fees and expense reimbursement are reasonable and consistent with the rates charged by professionals with comparable experience in the market.

21.    Other than the Debtor's agreement to compensate Balmoral as outlined in the Amended Agreement, Balmoral has not received any promises from the Debtor or any other person to compensate or reimburse Balmoral in connection with the Debtor's case.

22.    Neither Balmoral nor any members of Balmoral have divided, paid over or shared, or agreed to divide, pay over or share, (a) any compensation it has or they have received or may receive for services rendered or expenses incurred in connection with the Debtor's case with another party or person (except as among the members, managers and employees of Balmoral, or (b) any compensation another party or person has received or may receive for services rendered or expenses incurred in connection with this case.

**Exhibit B to Balmoral Application**
**Page 5 of 8**

23.     Prior to the Petition Date, Balmoral received the Engagement Fee of $20,000.00 under the Original Agreement and $25,000.00 under the Amended Agreement.

**Exhibit B to Balmoral Application**
**Page 6 of 8**

c.     **Eligibility and Disinterestedness**

24.     Balmoral performed the following actions to determine whether the firm has any conflict of interest or connection that would preclude Balmoral from serving as the Debtor's investment banker in this Chapter 11 Case:

a.     We performed a connections check on Haverhill, Haverhill's equity holders, Marathon Petroleum, SunCoke Energy, Wells Fargo, Bank of America, Regions Bank, and all potential bidders to whom Haverhill had already provided information at the time of our engagement.

b.     At the time we identified ALTIVIA as a party we might contact in connection with a transaction, we performed a connections check on ALTIVIA.

25.     Except as described below, the results of the foregoing conflict check process confirm that neither I, nor the Firm, nor any of its members or associates, to the best of my knowledge, have any disqualifying connections with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee or any person employed in the office of the United States trustee.

26.     In April 2015, Balmoral advised Axiall Corporation on the sale of its Specialty Phosgene Derivatives business to ALTIVIA, the proposed purchaser of Haverhill's assets. Balmoral is also engaged to represent ALTIVIA on a potential acquisition of another chemical business, although that engagement is inactive. Balmoral's engagement with ALTIVIA is unrelated to Haverhill. In no event will Balmoral be paid by ALTIVIA in connection with the acquisition of the Haverhill Plant.

27.     Neither I, nor the Firm, nor any of its employees, insofar as I have been able to ascertain, represent any interest adverse to the Debtor in the matters upon which Balmoral is to be engaged. To the best of my knowledge, Balmoral is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code, in that Balmoral and its members:

a. are not creditors, equity security holders or insiders of the Debtor;

b. are not and were not, within 2 years before the date of the filing of the petition, a director, officer or employee of the Debtor; and

c. do not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor, or for any other reason.

28.   Despite Balmoral's best efforts to identify and disclose its connections with the adverse parties in the Debtor's Chapter 11 Case, Balmoral is unable to state with absolute certainty that every client representation or other connection has been disclosed.  If Balmoral discovers additional information that requires disclosure, Balmoral will file a supplemental disclosure with the Court.

29.   The proposed retention of Balmoral is not prohibited by or improper under Bankruptcy Rule 5002.  Balmoral is qualified to represent the Debtor on the matters for which Balmoral is proposed to be retained.

30.   I believe that Balmoral is eligible for employment and retention by the Debtor pursuant to the Bankruptcy Code and the applicable Bankruptcy Rules.

I declare under penalty of perjury that the foregoing is true and correct and this declaration is executed at Chicago, Illinois, on September 24, 2015.

By: _____
Christopher D. Cerimele

**Exhibit B to Balmoral Application**
**Page 8 of 8**

# **EXHIBIT A**

## TO CERIMELE DECLARATION

# Exhibit A:  Professional Biographies

**Christopher D. Cerimele, Manager and Managing Director**

Mr. Cerimele is an experienced investment banker with more than 20 years of experience in investment banking, finance and accounting.  He has previously led the chemicals practices of leading global mid-market investment banks including Houlihan Lokey and Lincoln International.  He was also a senior member of the chemicals team at Grace Matthews.  Earlier in his career, Mr. Cerimele worked with leading global firms including CSFB and KPMG.

Over the course of his career, Mr. Cerimele has advised on more than $18 billion of chemical and industrial transactions.  Representative clients have included Axiall Corporation in the sale of its specialty phosgene derivatives business to ALTIVIA, Quad C Management on the sale of Royal Adhesives to Arsenal Capital, GenNx360 Capital Partners on the sale of SiVance to Milliken, Georgia Gulf in its merger with the chemicals division of PPG Industries, Eastman Chemical on its acquisition of Knowlton Technologies, and Chemtura Corporation on the sale of its antioxidants business to SK Capital.

Mr. Cerimele testified as an expert in court in connection with the Chemtura Corporation bankruptcy proceeding and has been a frequent speaker on chemical industry, M&A and capital markets topics. In 2010, he received a 40 Under 40 Recognition Award from The M&A Advisor. Mr. Cerimele holds a B.S. in accounting from the University of Southern California and an M.B.A. from The University of Chicago Booth School of Business. He is a Certified Public Accountant (inactive).

Mr. Cerimele is a member of the board of directors of East West Copolymer, LLC, a leading U.S. manufacturer of synthetic rubber.  He serves on the board of Chemical Marketing and Economics (CME) the business and technology group of the American Chemical Society's (ACS) New York Section.  He is also president of the board of directors of Adoption Center of Illinois, an Illinois 501(c)(3) adoption agency.


**Matthew R. Birch, Director**

Mr. Birch is an experienced investment banker with approximately 12 years of experience in investment banking, finance and accounting.  He has previously worked in a variety of investment banking disciplines domestically and internationally at leading global mid-market investment banks including Lincoln International, Incapital LLC, Donaldson Lufkin & Jenrette and CSFB.  Additionally, Matt served as Vice President and Chief Operating Officer of Incapital's London office.

Over the course of his career, Mr. Birch has advised on approximately $5 billion of large cap chemical transactions, $250 million of small and mid cap industrial M&A and capital structuring transactions, and $15 billion of investment grade debt issuance.  Representative chemical clients have included Ferro Corporation on the acquisition and financing of the polymer business of dmc2 and Dow Chemical's divestiture of its Chlor-alkali business.  Representative industrial clients have included EPS Solutions, Trantech, Metal Spinners, Niagara Thermal Products, and Aspect Automotion.

Mr. Birch earned a B.B.A. in Finance, with highest honors and distinction, from the University of Wisconsin and an M.B.A. from The University of Chicago Booth School of Business.


**Nathan P. Jacobs, Associate**

Mr. Jacobs recently completed the duel JD/MBA program at Case Western Reserve University where he concentrated in business and real property law as well as finance and corporate strategy. He is Bar certified in the State of Illinois. Prior to joining Balmoral Advisors, Nathan worked in mergers and acquisitions where he gained both finance and legal experience in the gaming and broader hospitality industry.

# PROPOSED ORDER

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HAVERHILL CHEMICALS LLC, | § | CASE NO. 15-34918 |
| | § | |
| DEBTOR. | § | (Chapter 11) |
| | § | |

ORDER PURSUANT TO SECTIONS 327(a), 328(a), AND 1107(b) OF THE
BANKRUPTCY CODE AND RULES 2014 AND 2016 OF THE FEDERAL
RULES OF BANKRUPTCY PROCEDURE AUTHORIZING THE RETENTION
OF BALMORAL ADVISORS, LLP AS INVESTMENT BANKERS TO THE
DEBTOR AND DEBTOR-IN-POSSESSION

Upon consideration of the application (the "Application")[1] of the Debtor for entry of an order pursuant to 11 U.S.C. §§ 327(a), 328(a) and 1107(b) and Rules 2014 and 2106 of the Federal Rules of Bankruptcy Procedure authorizing the retention of Balmoral Advisors, LLC ("Balmoral") as Debtor's investment banker, all as more fully set forth in the Application, and all exhibits and attachments to the Application, and upon consideration of and all proceedings before the Court related to the Application including the Court finding that: (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (iii) venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (iv) the Application and the Cerimele Declaration are in full compliance with all applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules of the Southern District of Texas, and orders and procedures of this Court; (v) Balmoral does not represent an interest adverse to the Debtor's estate with respect to the matters upon which they are to be engaged and are "disinterested persons" within the meaning of that term under §§ 101(14) and 1107(b) of the Bankruptcy Code; (vi) Balmoral is qualified to represent the Debtor's

---

[1]   All capitalized terms used but otherwise not defined herein shall have the same meaning assigned to them in the Application.

estate under §§ 327(a) and 328(a) of the Bankruptcy Code; (vii) the terms of Balmoral's employment have been disclosed and are reasonable under the circumstances; (viii) proper and adequate notice of the Application, the deadline to file any objections to the Application and the hearing thereon was given, and no other or further notice is necessary; (ix) the legal and factual bases set forth in the Application establish just cause for the relief granted herein; (x) the relief sought in the Application is in the best interest of the Debtor and its estate; (xi) any timely objection to the Application having been withdrawn or overruled for the reasons stated on the record at the hearing; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1.      In accordance with §§ 327(a), 328(a) and 1107(b) of the Bankruptcy Code, the Debtor is authorized to employ and retain Balmoral as of the date of filing of this chapter 11 case (the "Petition Date") as its investment banker under the terms and conditions set forth in the Application and the Amended Agreement.

2.      Balmoral is authorized to perform services for the Debtor that are necessary or appropriate in connection with this Chapter 11 Case.

3.      Balmoral shall be compensated for its services and reimbursed for related expenses in accordance with the terms and conditions of the Amended Agreement, as set forth in the Application and the procedures provided in §§ 330 and 331 of the Bankruptcy Code, and in accordance with applicable Federal Rules of Bankruptcy Procedure, Bankruptcy Local Rules of the Southern District of Texas, and any other applicable Orders of this Court.

4.      All compensation for services rendered and reimbursement for expenses incurred during this Chapter 11 Case shall be paid after further application to and order of this Court, in

accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Guidelines, and orders of this Court in this Chapter 11 Case.

5.      This order shall be immediately effective from the Petition Date and enforceable upon entry.

6.      The Debtor and Balmoral are authorized to take all actions necessary to effectuate the relief granted pursuant to this order in accordance with the Application.

7.      Balmoral and Haverhill shall file any supplemental Application in the event the scope of Balmoral's engagement is changed or enlarged.

8.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this order.

SIGNED THIS _____ day of _____, 2015.

_____
UNITED STATES BANKRUPTCY JUDGE